# Michigan Central Railroad Co.

### *v.*

# William N. Phillips *et al.*

1. Sale of chattels—*delivery—payment.* Where chattels are sold, and no time of payment is fixed by the contract, payment is a condition precedent, implied by law, and the title would not vest until payment, unless waived by the vendor.

2. Same—*waiver of payment.* The vendor, in such a case, may waive payment, and if he does, the title to the property sold will vest in the vendee.

3. Same—*bona fide purchaser.* But even where there has been no waiver by the seller, still, if he delivers the property to the purchaser, and

thus vests him with *indicia* of ownership, and he sells or pledges it to a *bona fide* purchaser without notice, the latter acquires rights which will be protected. Where the property is thus placed in the hands of the purchaser, as to third persons who become *bona fide* purchasers, it does not matter as to the intent with which it was delivered.

4. Such a case as the present is unlike one where something remains to identify or separate the property, or ascertain its weight, etc., as nothing remained here, not even a delivery, but to pay for the property, to complete the sale, and fully vest the title as between the contracting parties. Where one of two innocent parties must suffer loss by the fraud of another, the person who enables the commission of the fraud must suffer the loss.

5. Fraud—*void and voidable contract.* Fraud in the purchase of property does not render the sale void, but it is voidable at the option of the party defrauded And where a person purchases and acquires the possession of property by fraudulent means, and sells it to a *bona fide* purchaser without notice, the latter acquires title thereto before the sale is avoided and the property is reclaimed.

6. Pledge—*delivered as collateral security.* Where a person purchases a lot of highwines and is to pay for them on delivery, and they are delivered late in the afternoon, the seller saying he will leave them until the next morning when he will call and get his pay, and the purchaser ships them to New York and draws drafts on a bank and attaches the shipping receipts to the drafts as collateral security for the payment of the money, and the drafts are presented to a bank and they are cashed: *Held*, the bank, having no notice that the highwines had not been paid for, acquired a valid and binding lien on the property as a pledge for the payment of the money; and that it would be protected against the vendor's claim for the purchase money.

7. Bill of lading—*its transfer—delivery.* The transfer of a bill of lading by the shipper, on a sale or pledge of the property shipped, is a symbolical delivery of the property, and this, too, without any indorsement on the bill. The shipper, when he is the owner of the property shipped, does not lose his title by inserting the name of a consignee when he ships the property. The title still remains in him unaffected. In such a case, the consignee becomes the factor or commission merchant of the shipper.

8. Same. In such a case the same rule applies to the shipper who is not the owner, but has been put in possession of the property under such circumstances as to sell and pass the title to an innocent purchaser. Such a pledge and transfer of the bill of lading, transfers a legal and not a merely equitable title in the pledge.

60    190
113a  ³655

192          M. C. R. R. Co. *v.* Phillips *et al.*     [Sept. T.,

Opinion of the Court.

9. Bailee—*notice of adverse title to the pledge.* Where it appeared that it was usual, on the sale of highwines among dealers and rectifiers, to accompany the transfer with what are called coupons, but not with bankers who advanced money on drafts on bills of lading of highwines shipped, to have the coupons accompany the bills of lading: *Held,* that in this case the want of such coupons to accompany the bills of lading, was not notice that the pledgor had no title, or a defective one.

10. Notice—*payment.* A notice of defective title in the pledgor comes too late to affect the pledgee, after he has advanced the money secured by the pledge. To be operative, the notice should have been prior to the payment of the money.

Appeal from the Superior Court of Cook county; the Hon. Joseph E. Gary, Judge, presiding.

Messrs. Hoyne, Horton & Hoyne, for the appellants.

Messrs. Goudy & Chandler, for the appellees.

Mr. Justice Sheldon delivered the opinion of the Court:

The principal question which arises on this record is, whether there was such a delivery of the highwines in controversy, to Ames, as to vest title in him.

The contract of sale was from Moir & Co. to Ames, and on the 18th of July, 1870, Moir & Co. not having the highwines on hand, Phillips & Carmichael, the appellees, commission merchants of Chicago, for Moir & Co., purchased from Conklin & Bro. and Lynch & Co. one hundred barrels of highwines, fifty from each firm, to be delivered on that day to Wilson Ames, with directions, when delivered, to collect from him $1.07 per gallon, that being the contract price with Moir & Co., and pay Phillips & Carmichael nine cents per gallon of the sum collected—the price paid Conklin & Lynch being ninety-eight cents.

The fifty barrels bought of Conklin & Bro. are the wines replevied in this suit. They were at the Rock Island depot at the time of the purchase, the 18th of July. On the afternoon of that day, the whole one hundred barrels were hauled by the teamsters of Conklin & Lynch, and delivered at the store of Ames.

To countervail the effect of this as an absolute delivery, the testimony of Phillips, one of the appellees, is relied upon, who testified that, on the afternoon of the 18th of July, he went twice to Ames' business house, once between 4 and 5, and again between 5 and 6 o'clock, for the purpose of tendering to him the wines, and did not find Ames, nor any book-keeper or clerk, either time; found a laboring man there; and near 6 o'clock, when he left, he says : "I remarked to the man that I would leave those wines there until morning; I wanted to collect for them before I delivered them, and would be there in the morning; told him to tell Mr. Ames I would come down."

The next morning, Conklin & Lynch sent the bills to Ames' place of business to collect, but Ames did not pay them, and was not found, and failed in business, his store being closed by the sheriff that forenoon.

No time being stipulated by the contract for payment of the purchase price, its payment was a condition precedent implied by law, and the property would not vest in the vendee until he performed the condition, or the seller waived it. An absolute and unconditional delivery is regarded as a waiver of the condition. In this case, we should incline to hold that, as between the parties, the delivery was but conditional, and that, on the morning of the 19th of July, when Ames failed to pay the purchase price, the seller might have reclaimed the property from his hands.

It would be similar to the case of *Mathews et al.* v. *Cowan et al.*, 59 Ill. 341, where we held that the delivery of goods, and taking for the purchase price a worthless check, did not vest the property in the vendee.

But here, between the time of placing the goods in the control of Ames, and any movement to reclaim them, Ames had removed the goods and shipped them on board a car of the Michigan Central railroad for transportation to New York; had obtained bills of lading therefor for their delivery to the consignee, and the National Bank of Commerce, of Chicago,

13—60th Ill.

had cashed two drafts drawn by Ames on the consignee, with the bills of lading attached to them, in pursuance of a previous arrangement he had made with the bank to cash seven hundred barrels of highwines he was about to ship to New York, on bills of lading attached to drafts. The drafts amounted to $5700, were duly presented, but neither accepted nor paid by the consignee, and are still the property of the bank, wholly unpaid.

Although there might not have been, here, any waiver of the condition of payment as to the vendors, we are of opinion there was as to the bank, and that it is entitled to the protection of a *bona fide* purchaser without notice, if such be the position it occupies, which will be hereafter considered.

The rule in this respect, whether a *bona fide* purchaser, for a valuable consideration, without notice, in such case, is protected, is held differently in different States.

Such rule of protection is denied in *Dishon* v. *Bigelow*, 8 Gray, 159, it being held that such purchaser acquires no better right than his vendor had, and stands in the same situation. See, also, *Sargent* v. *Gile*, 8 N. Hamp. 225; *Sawyer* v. *Fisher*, 32 Maine, 28. While, in New York and Pennsylvania, the contrary rule seems to obtain. *Smith* v. *Lynes*, 1 Seld. 42; 6 Johns. Ch. 437; 1 Paige, 312; 1 Edw. Ch. R. 146; *Martin* v. *Mathiot*, 14 Serg. & Rawle, 214; *Rose* v. *Story*, 1 Barr, 190. In this State, the rule of protection of *bona fide* purchasers, in such case, must be regarded as the one established by judicial decision. *Jennings* v. *Gage et al.* 13 Ill. 614; *Brundage* v. *Camp*, 21 Ill. 330; *Butters* v. *Haughwout*, 42 Ill. 18; *The Chicago Dock Co.* v. *Foster*, 48 Ill. 507; *O. & M. R. R. Co.* v. *Kerr et al.* 49 Ill. 459.

In *Brundage* v. *Camp*, the authorities on both sides are reviewed to quite an extent.

That was a case of the sale of personal property, upon condition of giving a note with security for the purchase price, and permission to the purchaser to take the property, on the

express condition that the note should be given by the following Monday. The sale of the property by the purchaser, a day or two afterwards, without giving the note, was held to pass a good title. The great stress of the argument in support of the claim of the appellees, is, that all depends on the intent, and that there was here no intent to part with the property, or to give Ames any control over it, until they were paid. Nevertheless, the fact remains that they placed the highwines in the store of Ames, and gave him apparent dominion and disposing power over them, and enabled him to exercise the same, as he did. Now, as we regard the rule of the foregoing cases, had there been an express agreement made on entrusting the highwines in the hands of Ames, that he should have no control over them, and that they should remain the property of the vendors until paid for, it would not have availed to prevent the acquirement of a good title to the property by a *bona fide* purchaser from Ames, for a valuable consideration, without notice. And Phillip's declaration to the laboring man at Ames' store, could have no greater effect than such an express agreement.

The property here, where nothing remained to be done to complete the sale, either to identify the property or ascertain the price, was entrusted to the possession of the purchaser by the consent of the owner, under the form of a regular sale and delivery, and in the completion of the same ; and by its being thus placed under his control, Ames was enabled to obtain credit by pledging it to an innocent party.

The sellers did not see fit to exact payment at the time, as they might and should have done, where rights of innocent purchasers might intervene, but trusted to the personal security of Ames till the following morning ; and the consequence of this misplaced confidence should be borne by them rather than that the bank should be the sufferer by it. It is an instance for the application of the familiar rule, founded on sound reason, that where one of two innocent persons must suffer from the fraud of a third, the loss snould fall on him

who, by his imprudence, enabled such third person to commit the fraud.

It is sought to bring this within the class of cases where the property has been held not to pass, where something remained to be done to complete the sale, from the circumstance that the coupons, which accompany sales of highwines, were not sent with the wines, but with the bills the next morning. Although it seems customary for the coupon to accompany the sale of these wines, it is no muniment of title, or requisite of the sale. The making of the coupon on such sale is but a regulation prescribed by the treasury department for its own convenience and use in tracing the wines, in case a question should be raised whether they had paid the government duty or not. It contains descriptive marks of the wines, the serial numbers and wine-house numbers, and is for the purpose of identification.

It is quite unlike the case of *Andrew* v. *Deiterich*, 14 Wend. 32, cited by counsel for appellees, where one Simmons had purchased of the plaintiff carpeting to furnish his house, for which he was to pay cash. The carpeting, according to the custom of trade, was sent to Simmons' house in the *roll*, so that so much as should be required might be cut off, the residue to be returned, and the purchaser to pay for as much as was used. It was held, in an action against the defendant, an auctioneer who had made an advance upon the carpet some three weeks after it had been made up and laid down in the house, that there was no delivery of the property by the plaintiff which could divest his title to the carpet. There, something was to be done preparatory to ascertaining the price, by the vendee, for which possession was necessary; and the roll of carpeting was delivered to him, not because it was all sold to him, but for a special purpose, to wit : that the necessary quantity might be cut off to make the carpet.

We do not regard the non-delivery of the coupon, and its remaining to be made out according to custom, as altering the character of the delivery of the wines.

It is said this was a fraudulent purchase by Ames; that fraud makes void all contracts, and that no title passed because of the fraud.

A fraudulent purchase of property is not a void one; it is only voidable, at the election of the vendor, and until he does avoid it and reclaim the property, the fraudulent vendee may transfer a perfect title to a *bona fide* purchaser for value. *Rowley* v. *Bigelow*, 12 Pick. 306 ; *Root* v. *French*, 13 Wend. 570 ; *Mowrey et al.* v. *Walsh*, 8 Cow. 238.

The question remains to be considered, whether the bank stands in the relation of a *bona fide* purchaser for a valuable consideration, without notice, and is entitled to the benefit belonging to such position. The exact position of the bank is to be regarded as that of pledgee, it holding the highwines as collateral security for money advanced, but whether it has an absolute property, or but a lien upon the goods, is not material as respects the right to maintain this defense. In *Grosvenor* v. *Phillips*, 2 Hill, 153, it is said a conventional lien, by way of pledge or mortgage, may as well be raised in the hands of a carrier, as a right by absolute sale.

It is objected that there was no valid transfer of title, because the bill of lading was not indorsed. Where the shipper is the owner of the goods, and no opposing interest or claim arises on the part of the carrier, consignee, or prior indorsee of the bill of lading, but on the contrary the carrier, as in this case, admits and sets up the interest claimed to be derived from the shipper, it is not perceived why the indorsement of the bill of lading should be deemed necessary for the transfer of the title to the goods embraced in it. The shipper's title, where he is owner, does not depend upon the bill of lading, but is independent of, and before it. The mere insertion of the name of the consignee in the bill of lading, does not vest in him the ownership of the goods. In this case, the consignees were merely the factors and commission merchants of the shipper ; by the bill of lading the wines were to be delivered to them or the owner, it being the design, manifestly, to

vest the property in the consignees, only in case of their acceptance of the accompanying drafts which were drawn on them.

The bill of lading was the documentary evidence of the shipper's property in the hands of the carrier ; it represented the property, and the delivery of the bill of lading to the bank was a good symbolical delivery of the highwines, so as to vest the property in the bank.

It was as effective in transferring the possession as the delivery of the keys of a warehouse is of the goods contained in it, or of a storekeeper's receipt, of the goods described in it, *Wilkes et al.* v. *Ferris*, 5 J. R. 335 ; or of a warehouse receipt of the property it embraces. *Burton* v. *Curyea*, 40 Ill. 331 ; *Rowley* v. *Bigelow*, 12 Pick. 314.

And the bill of lading could be transferred to the bank by delivery merely, without any indorsement, so as to transfer the property in the highwines which it represented, to the bank. *Nathan* v. *Giles*, 5 Taunt. 588 ; *Allen* v. *Williams*, 12 Pick. 302 ; *The Bank of Rochester* v. *Jones*, 4 Comst. 497 ; *Marine Bank of Chicago* v. *Wright*, 46 Barb. 45 ; *O. & M. R. R. Co.* v. *Kerr*, 49 Ill. 459.

The last proposition seems to be conceded by the counsel for the appellees, had Ames been the real owner, but it is claimed not to apply here, where the shipper has no title, and the bank claims against the real owner. But we having already come to the conclusion that Ames was in a situation to make a valid title to a *bona fide* purchaser, it is now but a question as to the mode of transfer ; and the authorities cited establish, that the delivery of the bill of lading, unindorsed, was an effective transfer of whatever Ames was enabled to convey.

It seems to be supposed, too, that the bank got but an equitable interest by delivery of the bill of lading, and it is said that the equity of the appellees being equal and prior to that of the bank, they must prevail, as the bank did not acquire possession and the legal title before appellees replevied

the property. The delivery of the bill of lading, unindorsed, did not transfer a merely equitable title, like the delivery of an unindorsed note ; it gave as valid and effectual a title to the goods as could be obtained by an actual delivery of the goods themselves. There is no such thing here as a distinction of legal and equitable title, or actual possession being necessary to complete the legal title. The highwines were in the possession of the railroad company, merely as the servant of Ames.

A mere verbal contract of sale, without reference to the bill of lading, and without delivery of possession, would have passed the property as between the parties, and as to the appellees, they not claiming as creditors, mortgagees, or purchasers from Ames—or an independent written assignment, without reference to the bill of lading, might have been made. The delivery of the bill of lading, in connection with the circumstances, was evidence of a contract that the property should be held by the bank as security for the advance made, and was a symbolical delivery of the wines, tantamount to an actual one.

It is said to be a circumstance of suspicion which should have put the bank on inquiry, the absence of the coupon. Certainly not. Whatever the custom among dealers and rectifiers, that the coupon should accompany the transfer, it was shown in evidence that it was not the custom with banks, in advancing on drafts on bills of lading of highwines shipped, to have the coupons accompany the bills of lading, and had never been done in the previous similar transactions between Ames and the bank.

It is finally insisted that the bank did not pay its money before notice of the want of title in Ames.

It appears from the evidence that, on the morning of the 19th of July, 1870, Ames had a small balance of $200 or $300 standing to his credit at the bank ; that the amounts discounted to him on these drafts were placed to his credit, and a check by Ames for a somewhat larger amount than both

drafts was presented immediately and certified, and that a check was paid shortly afterwards which reduced Ames' balance to something less than $50, so that if these drafts had not been returned there would have been a balance to his credit of a little less than $50.

The cashier further testifies that, somewhere within a half hour, he should think, after the money had been placed to Ames' credit, he saw Ames standing with another gentleman at the teller's window, and he saw a package of money passed out to the gentleman who was with Ames; and that there has been no settlement with Ames for any portion of his indebtedness to the bank.

We are fully satisfied from the evidence, that this certified check covering the amount of the drafts, was paid before any notice of appellees' claim, notwithstanding the fact that the bank has not produced the check, or shown by its books its payment, and the conjectures made by counsel that it might have been some other check that was paid, or that the check might have been payable to Ames himself, and be still in his hands.

The production by the bank, of the check cancelled, would have been stronger evidence of its payment, but not necessary in order to satisfy us of the fact.

The judgment must be reversed and the cause remanded.

*Judgment reversed.*