CHARLES H. TAYLOR

*v.*

DANIEL W. TURNER.

1. PLEDGE—*what a delivery of grain shipped.* The delivery by a purchaser of grain to his vendor, at the time of the shipment, of the railroad receipts, as a security for the payment of the purchase money, is a symbolical delivery of the grain as a pledge, and vests in the pledgee a special property entitling him to the proceeds of the grain to the amount of his debt.

2. SAME—*neglect to give notice of party's right.* The neglect of a party holding railroad receipts for grain shipped, as security for the payment of drafts given by the shipper to him for the purchase money on the consignee, to give notice to the consignee of his right, until the latter has sold the grain and applied the proceeds on an indebtedness of the shipper to him, under a previous agreement, will not interfere with the assertion of the rights of such party as against the consignee, who has not parted with anything or incurred any liability on the credit of the grain coming to his possession.

3. SALE—*interest of purchaser of grain pledging same for price.* Where a purchaser of grain agrees, before shipment, with the seller, that the seller shall ship the same to the purchaser's commission merchant for sale, in the purchaser's name, and the purchaser draws drafts on the commission merchant for part of the price, and delivers the same, with the railroad receipts, to the seller, the purchaser's only interest in the grain will be that of pledgor—that is, the surplus in the proceeds of sale after payment of the drafts; and he can not give to the consignee any greater interest than he himself has, even by a pre-existing agreement.

4. CONSIGNMENT—*delivery to consignee.* Delivery to a carrier is considered as a delivery to the consignee only when and as it is in agreement with the terms and intention of the shipment.

5. TROVER—*when it lies.* Where grain, with the consent of both the seller and buyer, is consigned to, and goes into, the hands of a commission merchant for sale in the market, trover will not lie against the commission merchant for selling the same by the original seller of the grain who holds railroad receipts for the grain, or by one succeeding to his rights.

6. MONEY HAD AND RECEIVED—*when it lies.* Where a consignee of grain sells the same, he will be liable, in an action for money had and received, to the holder of the railroad receipts for the proceeds of the sale to the extent of his interest in the grain, as pledgee or otherwise, even though he has no notice of such rights at the time of the sale, and has applied the proceeds upon an indebtedness of the shipper.

7. CHANCERY JURISDICTION—*trust—remedy at law.* In case of the bailment of property to a factor in trust to sell, on his refusal to pay the proceeds to the person entitled to the same, a court of chancery has no jurisdiction to enforce the trust, there being a complete remedy at law in favor of the party entitled to the money.

APPEAL from the Circuit Court of Cook county; the Hon. W. W. FARWELL, Judge, presiding.

This was a bill in chancery, brought by Daniel W. Turner against Charles H. Taylor and R. S. Trotter, to recover the proceeds of the sale of certain wheat sold by Taylor, as a commission merchant; the bill alleging that he took the same in trust, and holds the proceeds as trustee. On hearing, upon proofs, there was a decree of recovery in favor of the complainant, and the defendant Taylor appealed.

The proofs show, that on October 11, 1872, at Steamboat Rock, Iowa, Turner sold to Trotter, one of the defendants, a quantity of wheat, then in the elevator of Turner, at that place. At the same time, Trotter drew upon Taylor, a commission merchant in Chicago, two drafts in favor of Turner, and delivered them to him in part payment of the wheat. It was agreed between Trotter and Turner, at the time of the sale, that Turner should ship the wheat at that place, Steamboat Rock, upon the railroad, consigned to Taylor; that railroad receipts, in Trotter's name, should be received for the

wheat so shipped, which should be attached to the drafts. The dates of the drafts were left blank, with instructions to Turner to fill the same on shipment of the wheat. The wheat was so shipped in ten cars, three of them being loaded on the 11th, three on the 14th, and four on the 16th of October, 1872, the railroad company, by their station agent, giving ten railroad receipts, one for each car load, substantially, in form, as follows:

"*S. B. Rock Station, Oct.* 11, 1872.

"Received of R. S. Trotter, in apparent good order, by the Central Railroad, of Iowa, consigned as marked and described in the margin below, the following property, subject to the conditions and general regulations as appear in published tariff of said company, for the time being.

"The above company will not be held responsible  *  *  .

"Marks and destination: C. H. Taylor, Chicago, Ill.; 1 car bulk wheat, Nor. D. I. C: 3882; weight: 20,000.

A. L. LEONARD."

One being dated Oct. 11, the others Oct. 14 and 16, 1872, excepting one, dated the 17th.

These railroad receipts were attached to the drafts, one being for $1520.50, and dated October 14th, the other for $1312.50, dated October 17, 1872. The drafts, with the railroad receipts attached, were discounted by the Farmers' Exchange Bank of Steamboat Rock, and sent by that bank to the Union National Bank of Chicago for collection. The drafts were protested for non-payment by a notary public on the 17th and 18th of October, 1872, and returned to the Farmers' Exchange Bank, which were charged to Turner on October 22. The drafts were taken up by Turner, and became his property. Taylor received all the wheat, except one car load, without the production of the railroad receipts, receiving it from the 16th to the 18th of October, and made sale of it from the 17th to the 19th of October, except two car loads, which he surrendered to Turner. On October 21, 1872, Turner himself went into Chicago, and made demand upon

Taylor of the wheat, and also for payment of the drafts, which Taylor refused, with the exception of the two car loads named, on the ground that he had advanced to Trotter more than the value of the wheat consigned to him.

It was in evidence, that Trotter had, for some time previously, been in the habit of consigning grain to Taylor for sale, and the latter had allowed Trotter to overdraw his account, there being an arrangement between them that Trotter was to consign his grain to Taylor for sale on account of the former, the proceeds to be applied to Trotter's credit on account; that from the 10th to the 21st of October, 1872, Trotter's account was overdrawn some $5000, and that after crediting Trotter with all the proceeds of the wheat in question, there was a balance of several hundred dollars due to Taylor on account.

It was proved to be the custom of the trade in Chicago, for consignees not to present the railroad receipts, like those given here, in order to obtain possession of the grain, but that it is the custom for the railroad companies to give to consignees freight bills of what is consigned to them, and on presentation of such freight bills, paid, warehouse receipts for the grain are issued to the consignees, no one requiring the production of these railroad receipts.

Messrs. HERBERT & QUICK, for the appellant.

Messrs. HITCHCOCK & DUPEE, for the appellee.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

As to the right of the parties, there would seem to be little room for serious question.

Had Trotter been the absolute owner of the wheat at the time of the shipment, the delivery by him to Turner of the railroad receipts, as security for the payment of the purchase money, would have been a symbolical delivery of the wheat, and have vested in Turner a special property therein, entitling

him to the proceeds of the sale of the wheat to the extent required for the payment of the price. *Gibson* v. *Stevens,* 8 How. 384; *The Bank of Rochester* v. *Jones,* 4 Comst. 497; *The Marine Bank of Chicago* v. *Wright,* 48 N. Y. 1; *Nat. Bank of Green Bay* v. *Dearborn,* 115 Mass. 219; *Michigan Central R. R. Co.* v. *Phillips,* 60 Ill. 190.

It is, however, claimed, that there was here a pre-existing agreement between Trotter and Taylor, which placed the former under obligation to send his wheat to the latter, to be sold by him for the reimbursement of his advances made on the credit of grain to be consigned to him by Trotter; that Taylor was largely in such advance at the time of this transaction, and that under such circumstances, at least, the delivery of the wheat on the railroad consigned to Taylor, as well as the delivery to him from the railroad, vested the property in him. Allowing the utmost extent that can be claimed for this agreement, that it was one to thus consign to Taylor *all* the grain which Trotter should buy, then there would have been here but a breach of promise, as Trotter did not so consign this grain, except as to the surplus above paying Turner. Such an agreement would be one in relation to property to be afterward acquired, and could have no effect in giving the title to any such property until after it had come into the possession of Taylor. But before this wheat came into the possession of Taylor, the rights of Turner had attached, and when it came to Taylor, Trotter's only interest in it was his right thereto, subject to the pledge of the property which he had made to Turner for the payment of the drafts, and Taylor received no greater interest.

Delivery to a carrier is considered as a delivery to the consignee only when, and as, it is in agreement with the terms and the intention of the shipment.

The wheat was not delivered on the railroad, or shipped, on the sole account or for the sole benefit of Taylor, but expressly for the sole use and benefit of Turner, to the extent of securing him for the purchase price of the wheat, and for the benefit of Taylor only as to any surplus which might remain. In-

deed, such surplus was all the actual interest which Trotter, the consignor, had in the property to consign. He never, in truth, had any interest therein except as pledgor, as the sale to him and the pledge by him were simultaneous acts. It was a part of the very transaction through which he obtained any title to the property that the railroad receipts were pledged by him to Turner, to secure the payment of the purchase money drafts.

It is asserted, that prompt transmission and presentation of the drafts were necessary, and the point is made, as against the right of Turner, that there was *laches* in not forwarding the drafts, with the railroad receipts attached, until Taylor had got actual possession of the wheat, and sold it, and applied it to his general balance.

The drafts, with the receipts attached, appear to have been forwarded in the regular course of business, for collection. It would rather appear, from the evidence, that the drafts were not presented to Taylor, personally, for payment, and it leaves it probable that at least a portion of the wheat was sold by him before he had any notice of Turner's rights.

· It is not pretended that Taylor advanced or parted with anything, or incurred any liability, or in any respect changed his position to his disadvantage, on the credit of the property. Had he done this, a different question would be presented, but his debt had already accrued. His claim simply is, that the property shall pay an antecedent debt to him.

It is not suggested that he has been in any way injured by the delay of Turner in giving notice of his right, and we can not think that, under the circumstances, delay in giving such notice until after the sale of the wheat should interfere with the assertion of that right. And, under this view, it would seem to be immaterial what the custom in Chicago was as to the railroad delivering property to the consignee without the production of the railroad receipt, there being no intervening rights.

It is objected that the right of action here, if there be any,

is in the Farmers' Exchange Bank of Steamboat Rock, and not in Turner. It is supposed that if the adverse claim against Taylor be sustained, then the sale of the wheat by Taylor was a conversion of it; and as at that time the drafts and railroad receipts were in the hands of, and belonged to, the bank, it is contended that there was then, after the sale, but a right of action in the bank in trover, which right of action must still remain with the bank, and did not pass to Turner upon his taking up the drafts.

There would hardly seem here to have been any wrongful conversion of the wheat, so as to give the right to an action of trover. By the consent of both Trotter and Turner, the wheat was consigned to, and went into the hands of, Taylor, to be sold. There is no pretense that there was any retraction of the consent or demand of the wheat until after it had been sold, so that the proper remedy, under the facts, would seem to be the action for money had and received. We think that, upon Turner taking back from the bank the drafts, with the railroad receipts attached, there passed to him, as an incident, the right to maintain such an action, as the owner of the drafts and railroad receipts might; that the implied promise which the law raised, was to pay the proceeds of the wheat to the owner of the drafts and railroad receipts, and to such owner not only at the time when the wheat was sold, but at the time of the bringing of the suit.

Another objection made, and which we are inclined to sustain, is, that there was here an adequate and complete remedy at law.

It seems to us to be a simple case of the bailment of property to a factor to sell, and his refusal to pay over the proceeds of the sale to the owner of the property, and we know not why the legal remedy of an action for money had and received is not ample. If, by the allegation that the property was received upon a trust, the case may be brought within the jurisdiction of a court of chancery, we do not see why it might not be the same in every case of the bailment of personal property.

Blackstone's definition of bailment is, "a delivery of goods in trust, upon a contract expressed or implied, that the trust shall be faithfully executed on the part of the bailee." 2 Black. Com. 451. So that a trust may be predicated of every case of a bailment.

And we do not see why, in like manner, all that large class of cases where the action for money had and received for another's use is maintained, might not be drawn within the jurisdiction of a court of equity by making the allegation of the receipt of the money in trust to pay the same over to another.

.Trusts, though in general of a peculiar and exclusive jurisdiction in equity, are sometimes cognizable at law, as in the cases above mentioned and the one now before us; and when so cognizable, and the remedy at law is adequate and complete, as we regard it here, we think such remedy should be pursued, and that it should not be left with a plaintiff at his will, by the selection of the forum, to deprive the defendant of the so much prized privilege of trial by jury which exists at law. See *Doyle* v. *Murphy,* 22 Ill. 502. ·

Upon the last ground the decree will be reversed, and the cause remanded with directions to the court below to dismiss the bill without prejudice.

*Decree reversed.*