ISRAEL P. RUMSEY AND AUGUSTIN C. BUELL

v.

J. H. NICKERSON, C. B. KENNEDY, INTERVENOR.

*Attachment — Interpleader — Advances upon Consignments — Draft— Shipping Receipt—Delivery—Evidence.*

1. Although a draft upon consignees in favor of one making advances is dishonored, the delivery of the shipping receipt to such person is equivalent to a delivery of the property in question.

2. In attachment proceedings involving a carload of flax seed, a third person claiming title thereto, it being shown that contracts had been entered into between him and the defendant touching advancements upon consignments, this court holds that the action in the premises of the bank-named, was simply as agent for the intervenor, its president, whose private means were alone involved; that the cancellation of the draft referred to by charging the same to defendant, cut no figure, as under one of the contracts previously entered into the seed was the property of the intersvenor while he remained in possession thereof, and until advances were paid; that the drawing of the draft was merely a method of carrying out such contract, and declines to interfere with the judgment in his behalf.

[Opinion filed December 24, 1889.]

APPEAL from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge, presiding.

Mr. JOSEPH B. LEAKE, for appellants.

The claim of the intervenor is that, under the agreements for lien or title, unacknowledged and unrecorded, he is the owner of property subsequently acquired, which was left in

the possession of Nickerson, with privilege of sale when and to whom he pleased, against the rights of an attaching creditor in another State, to which the property has been sent.

As against these appellants, said agreements are void. "A *bona fide* creditor, who, under a judgment and execution, acquires a lien on property thus situated, occupies the same position, in all respects, as does a *bona fide* purchaser. Where the apparent owner of property thus acquired has the *indicia* of ownership, and may sell and pass a good title to a purchaser, without notice, a *bona fide* creditor may seize the property on execution, and sell it thereunder, and pass the title, not only against the apparent, but also the real owner. The creditor and purchaser stand on the same footing and each will be protected." Van Duzor v. Allen, 90 Ill. 499.

The lien of these instruments can not be claimed to be better than that of a chattel mortgage. A chattel mortgage is void if sale be permitted. Davis v. Ransom, 18 Ill. 402; Read v. Wilson, 22 Ill. 377; Barnet v. Fergus, 51 Ill. 352; Greenebaum v. Wheeler, 90 Ill. 296.

Subsequently acquired property is not held by a chattel mortgage or pledge. Hunt v. Bullock, 23 Ill. 324; Gittings v. Nelson, 86 Ill. 591; Taylor v. Turner, 87 Ill. 300.

Chattel mortgage is only lien from time of record. Blatchford v. Boyden, 122 Ill. 657.

Notice of chattel mortgage is not binding. Frank v. Miner, 50 Ill. 444; Lemen v. Robinson, 59 Ill. 115; Sage v. Browning, 51 Ill. 217; McDowell v. Stewart, 83 Ill. 538.

And notice that is for purchase money with an agreement for a lien, is not valid. Blatchford v. Boyden, 122 Ill. 668.

The lien of said instruments is invalid by the law of Dakota. Sections 4379, 4657, 4384, 4330, 4345, 4394, 4397 Compiled Laws of Dakota, in evidence in record, pages 205 and 206.

The instruments are invalid under the law of Illinois. Statutes, Chap. 95, Sec. 1.

The intervenor claims that he is the owner of the property by virtue of the draft dated March 16, 1888, and the shipping receipt attached.

J. H. Nickerson the defendant, was the consignor of the flax

seed, and the shipping receipt was given to him as owner. At that time he had a deposit account in the Bank of Canton, which had not been overdrawn since December 31st. He owed nothing to the bank. A draft was drawn in his name as consignor (by his employe, Waldo) for $500 on the consignees in Chicago, and the shipping receipt was attached to it. The amount of the draft, $500, was placed to the credit of Nickerson's account. He might have checked it out, but he did not. The transaction was a loan by the bank to Nickerson of $500 secured by the pledge of the receipt as a symbol of the property.

" The delivery of the bill of lading  *  *  *  was evidence of a contract that the property should be held by the bank as security for the advance made," and was a symbolical delivery of the property. M. C. R. R. Co. v. Phillips, 60 Ill 197, 198; W. U. R. R. Co. v. Wagner, 65 Ill. 198; Peters v. Elliot, 78 Ill. 321; Canadian Bank v. McCrea, 106 Ill. 295; Jones on Pledges, Secs. 5, 7, 8, 10, 231.

A delivery of property without a written conveyance can not be a mortgage, but must be a pledge. Jones on Pledges, Sec. 5.

A pledge differs from a mortgage of personal property in being a lien on property and not a legal title to it. Jones on Pledges, Secs. 7, 8, 10.

The exact position of the bank is to be regarded as that of pledgee, etc. M. C. R. R. Co. v. Phillips, 60 Ill. 197.

The pledge was given to secure the Bank of Canton the payment of that specific $500, and for that purpose it was a lien upon the property.

The draft was protested, and with the shipping receipt was returned to the bank. Nickerson's account was good for the amount and the draft was at once charged to him. Nickerson thereby paid the draft and it was filed away. That draft was paid and the lien to secure it was thereby released, and the property was Nickerson's and free from the lien. It was then in the possession of the sheriff under the attachment in this case, in favor of Nickerson's creditors, and they can hold it as Nickerson could, free from that lien.

At the end of the month Mr. Kennedy says he took possession of the draft. "It was against grain of mine, and I retained it in my possession." He does not say how he got the shipping receipt—presumably by its being attached. The claim of the intervenor now is, that because he held a note of Nickerson for a debt due two and a half months before to him, that he can take possession of this draft for a different debt to the bank and transfer the lien to secure the draft after its payment and make it secure a note payable to him, and thereby make him the owner of the property, as against the attaching creditors. The bank itself could not have held the pledge as security for the payment of any other indebtedness to it, than the one it was given to secure. Story on Bailments, Sec. 304; 2 Kent's Commentaries, p. 584; Woolly v. Louisville Banking Co., 81 Ky. 527; Morris v. Tillson, 81 Ill. 607; Baldwin v. Bradley, 69 Ill. 32; Jones on Pledges, Sec. 551.

Messrs. FLOWER, SMITH & MUSGRAVE, for appellee.

GARNETT, J.   The defendant, Nickerson, a resident of Canton, Dakota, was engaged in purchasing at that place, and shipping to Chicago, grain and stock.   In the course of his business he became indebted to appellants, and the amount of the debt on March 20, 1888, being $751.54, on that day they commenced an attachment suit against him, and levied the writ on a carload of flax seed, which had been shipped to Chicago by him.

There was a judgment by default against him for $796.63, but C. B. Kennedy appeared in the suit and by interplea claimed the flax seed as his property.   The issue formed on the interplea was tried by the court without a jury, finding and judgment entered for Kennedy, and appeal by plaintiffs.

Kennedy's title grew out of these facts:   He was president of the Bank of Canton, with which Nickerson commenced to transact his business on October 15, 1887.   By written contract of that date between Kennedy and Nickerson, it was provided that in consideration of Kennedy furnishing him money to buy grain and stock in the city of Canton, said Ken-

nedy should have a lien upon all stock and grain bought by
Nickerson, for the payment of all advances that might be
made by the Bank of Canton or Kennedy; that all grain should
be shipped in the name of Nickerson, who should draw for
all proceeds of grain shipped through the Bank of Canton,
the drafts being placed to his credit; that he should pay to
the bank or to Kennedy seventy-five cents per thousand for
all moneys paid out upon his check or orders or his account,
and pay twelve per cent per month upon all daily balances
against him caused by overdrafts. By another written
contract made afterward, and about October 29, 1887, Nick-
erson agreed, in consideration of Kennedy furnishing money
and directing the bank to pay his (Nickerson's) checks,
that all grain bought by him since October 16, 1887, " is the
property of said C. B. Kennedy;" that " all grain stored in
granaries or in transit is the property of said C. B. Kennedy
until all moneys advanced by said C. B. Kennedy are fully
paid;" that Nickerson should have the right to ship all the
stock and grain in his own name, to such parties as he might
select; that drafts for proceeds of such shipments should be
made through the bank and placed to his credit and all of his
checks for grain or stock charged to him; that the intention
was that all money to purchase such stock or produce, should
be furnished by Kennedy, and the property should be his
until the money was repaid with twelve per cent interest, and
seventy-five cents per thousand for exchange, and that Nick-
erson should have all the profits and bear all the losses; that
it was the intention that out of the proceeds of such sales the
money advanced for the purchase of said grain and stock
should be first paid to Kennedy through the Bank of Canton;
that Nickerson should account to Kennedy the full amount
of sales of all grain made up, to the amount of money fur-
nished and interest and exchange as stated. Neither of these
contracts was acknowledged or recorded.

From October 15, 1887, to March 20, 1888, the account on
the books at the bank representing these grain transactions,
was kept under the title of " J. H. Nickerson grain account,"
and a separate account was kept with Nickerson for his other

business.   Checks to pay for grain were not in the ordinary form, but were tickets, giving the name of the seller, the number of bushels of grain and the price per bushel.   About January 1, 1888, Nickerson was found overdrawn on the grain account, something over $2,000, which was then settled by Kennedy giving his check to the bank for the amount and receiving from Nickerson his note for the same amount; after that time the business between Nickerson, Kennedy and the bank continued as usual, but there appears to have been no subsequent overdraft on that account.

The car of flax seed in question was purchased a few days before it was shipped to Chicago.   Nickerson testified that it was purchased with money which he drew from the Bank of Canton, but he could not swear whether the money was really furnished by Kennedy or the bank.   Kennedy testified that it was his money that was furnished Nickerson, and of this we find no contradiction.   When the flax seed was shipped, a draft for $500 was drawn by Nickerson against it, on the consignees, to the order of the bank, the shipping receipt being attached thereto, and the $500 credited to the "J. H. Nickerson grain account."   Before the draft was presented for payment, appellants had caused their attachment writ to be levied on the seed, and the draft being dishonored on presentation, was returned to the Bank of Canton and the amount thereof charged to the "J. H. Nickerson grain account."   The draft itself was filed away, but the shipping receipt was retained and afterward came into the possession of Kennedy.   The flax seed was sold by order of the trial court, and it is admitted that the proceeds of sale are not sufficient to pay the balance due Kennedy on advances made under the two contracts.

Appellants contend that the transaction, when the flax was shipped, was in substance a loan of $500 by the bank to Nickerson, secured by the ·pledge of the receipt as a symbol of property ; that when the draft, after payment refused, was charged up against the grain account, the lien was released; that Nickerson then had the right to take it and his attachment creditors can hold it just as he could.   But we think

it evident that the grain account was not Nickerson's account with the bank, but Nickerson's account with Kennedy; that the bookkeeping was done by the bank and its only interest in the transaction was in the exchange of seventy-five cents per thousand dollars; that the credit of the $500 to the grain account was a credit given by Kennedy to Nickerson, and the charge of the amount of the dishonored draft was a charge by Kennedy against Nickerson. It is true the draft was thereby canceled, but the delivery of the shipping receipt was equivalent to delivery of the property. M. C. R. R. Co. v. Phillips, 60 Ill. 190 ; Peters v. Elliott, 78 Ill. 321 ; Taylor v. Turner, 87 Ill. 296; W. U. R. R. Co. v. Wagner, 65 Ill. 197.

The bank was but the agent of Kennedy in all the transactions with Nickerson. It received the symbolical delivery of the property for Kennedy, and as long as it retained the shipping receipt it was kept for his benefit. After the $500 draft was charged up against the grain account, Nickerson was not entitled to possession of the flax seed. If he had demanded possession, Kennedy could have resisted his claim by setting up the second written contract between them, which provided that the grain was to be the property of Kennedy until all moneys advanced by him were repaid. Under that contract Kennedy had the right to be paid the money advanced by him for the purchase of grain, and though the draft for $500 was canceled by charging it against the grain account, neither Nickerson nor any one claiming under him could, directly or indirectly, divert the proceeds of the flax seed so as to avoid the effect of the contract, so long as Kennedy remained in possession of the property. The drawing of the draft was merely a method of carrying out that part of the second contract which gave Kennedy the right to payment of his advances out of the proceeds of the sale of the flax seed, and that method failing, he could defend his possession against an attack that threatened to deprive him of the benefit of the contract.

No propositions of law were requested of the court, and the evidence sustains the finding. The judgment is affirmed.

*Judgment affirmed.*