# CLAYTON M. ZIMMERMAN vs. CHARLES E. FRUSH-OUR, Admr., etc.

*Gift from Principal to Agent—Independent Advice—Validity of Gift from Servant to Master.*

A gift from a principal to his agent, when it is the voluntary act of the donor free from undue influence, will not be annulled merely because the donor did not have independent advice at the time of the transaction.

There is no such presumption of law against the validity of a gift from a principal to his agent, as there is in the case of a gift to one holding a confidential relation to the giver in which dominion is implied, but the burden of proving that a gift by the principal was not his deliberate and uncontrolled act, is upon the party attacking its validity.

A woman who was a domestic servant in the family of the defendant's father at the time of defendant's birth, and who continued in that service, and afterwards in the service of the defendant himself upon his marriage, and until her death, serving thus altogether for upwards of forty years; who had always been treated as a member of the family, and who had invariably exhibited great affection for the defendant, gave to him fifteen hundred dollars to be used in buying a farm. The defendant had acted as the woman's agent in managing her bank account, in which were accumulated her wages. After her death, the administrator of her estate filed the bill in this case to vacate the transaction and recover said sum. The evidence examined, and *held* to show that the transfer of the money to the defendant was intended to be a gift and not a loan, that it was the voluntary and deliberate act of the donor and that the gift was not voidable on the ground that the donor did not have the competent and disinterested advice of some third party at the time of making it.

*Decided May 13th, 1908.*

Appeal from the Circuit Court for Frederick County (Henderson and Motter, JJ.)

The cause was argued before Boyd, C. J., Pearce, Schmucker, Burke and Worthington, JJ.

*Jacob Rohrback*, for the appellant.

*Wm. P. Maulsby, Jr.*, and *Charles C. Waters* (with whom was *Emory L. Coblentz* on the brief), for the appellee.

PEARCE, J., delivered the opinion of the Court.

The bill in this case was filed by the appellee as administrator *d. b. n.* of Mary C. Frushour, deceased, against Clayton M. Zimmerman in the Circuit Court for Frederick County, alleging that said Zimmerman was the confidential agent of the said Mary C. Frushour from the year 1894 up to the date of her death in December, 1904, and that as such agent, he attended to all her business affairs during the whole of this period. It further alleges that during the month of March, 1897, said Zimmerman obtained from the said Mary C. Frushour by way of gift, but through an abuse of the confidential relationship alleged to exist, the sum of fifteen hundred dollars; that said alleged gift was not the free and voluntary act of said Mary C. Frushour, and was fraudulently procured, and has ever since been fraudulently withheld. The prayer of the bill is that the defendant be compelled to pay to the plaintiff the said sum of $1,500 with interest from March 29th, 1897, and for such other and further relief as the case should require. The defendant answered the bill under oath admitting that he had received from Mary C. Frushour as a gift, on March 29th, 1897, the sum of $1,500, and that he had transacted many items of business for her during many years, but averred that the alleged gift was her free and voluntary act and that it was not obtained by any act of fraud on his part, or any abuse by him of any confidential relation existing between them. A large mass of testimony was taken before an examiner, and after hearing, a decree was passed setting aside the alleged gift, and requiring the defendant to bring into Court said sum of $1,500, to be paid to the plaintiff, and this appeal is from that decree.

It appears that Mary C. Frushour entered the family of Ephraim J. Zimmerman, the father of the defendant, as a domestic, in the year 1862, when she was about 18 years of age, and continued in the service of that family until her death in

1904.  The defendant was born in 1867, and was married in 1888, when Miss Frushour left old Mr. Zimmerman's house and went to live with the defendant, where she ever afterwards lived, and where she died.   The undisputed evidence, is that she was devotedly attached to him from his birth, and that her affection never faltered, but continued undiminished until her death.   Mr. Thomas, who taught school near there, and boarded in the family when the defendant was an infant in arms, testified that "she cared for him and thought as much of him as a mother could think of a child," and he spoke from a continuous experience of six years while boarding in the house.   He continued to live near them always, after ceasing to board there, and testified that she was always treated as a member of the family and enjoyed as many privileges as Mr. Zimmerman's daughter; and in answer to a question whether he knew anything of the relations existing between her and the defendant during the latter years of her life, said, "They were the same in her last years as they were when Clayton was a baby."

George West, a colored man employed in the defendant's own family for a number of years, whose testimony was intelligent, and evidently unbiased, said: "She seemed to think as much of him as if he were her son, and just as much of his children, and that he always done things just her own way; he never done anything contrary to her way."   When asked to explain what he meant by the last expression, he replied, "if he were going to do any work about the house or place, and if she wanted it done different from what he intended to do it, he would do it, and I never heard him give her a cross word."

Hester Zimmerman, defendant's sister, testified that; "she was as good to him as a mother; would not let him be abused in any way;" she said, even after he became a man, Mary would "watch after him for fear he would get hurt," and in illustration of this, said that when he was about to climb upon the house to put on some yellow wash, she said he should not do it, and she would pay some one out of her own pocket

to do it; and on another occasion, the same was said by her when he was about to go down a well to clean it out.

There is an allegation in the bill of complaint that this sum of $1,500 was obtained as a loan, and was not intended by Miss Frushour as a gift, but this is not sustained by a particle of evidence. Samuel Gover did testify that the defendant told him he had once borrowed some money from Mary, but that this was about the time he began farming; he also testified that on one occasion when he wanted some change to pay his hands, defendant told him he thought Mary could change some money for him as he had just *given* her her interest money, but when pressed to say if defendant spoke of interest on borrowed money, he said he did not, and he emphasized the fact that defendant had previously told him he attended to her bank business, and that "he had just *given* her her interest not long ago;" and it appeared from the testimony of the officers of the bank in which Mary kept her accounts, that the semi-annual interest thereon was always paid through the defendant.

The evidence shows that the only business Mary had was the management of her bank account, and that for this purpose the defendant was her duly authorized agent, and in this respect only sustained a confidential relation to her. The evidence also shows that she received regular agreed wages for her services up to a year or two before her death, but that when her health failed and she became unable to work, she declined to receive wages, and only received her board without charge. She was not educated, and perhaps might be classed as illiterate, but she could read, and could manage to write, though it is not clear that she could read writing. Mr. Thomas, whose opportunities to know were ample, and who is in no manner interested, testified he had observed her reading books and papers, and had heard her relate what she read in the newspapers, and he mentioned the Bible, The Reformed Church Messenger, The Examiner, and the Frederick Times, as books and papers she was accustomed to read. The history of this transaction must be gathered from the testimony

of others than the defendant, as he was clearly incompetent under the provisions of our Code to testify in this proceeding as to any transaction had with, or statement made by her, and this practically eliminates all of his own testimony of any importance.    It had its origin in the purchase by the defendant of what is called in the testimony, "The Taylor property." Calvin Thomas says, "The Reformed Congregation at Mount Pleasant, wished at that time to purchase the Taylor property, and Clayton (the defendant) was solicited to attend the sale and make the purchase, which he did, after which the congregation found themselves unable to comply and the property was thrown upon his hands.    He gave between $1,700 and $1,800 for it."    Mr. Thomas was then a member of this church consistory and had full knowledge of all these facts, and Miss Frushour was a member of and a contributor to this church.

Hester Zimmerman's statement of the transaction may be best given in her own words.    She said, "In the spring of 1897 the Taylor property was to be sold.    You heard the other part of Mr. Thomas' statement, so it was throwed back on Clayton's hands, and Clayton said he did not feel able to purchase it at that time, his health was in bad condition, and the property needed a great deal of repairing and he didn't feel able to do it.    Mary says to Clayton, 'you buy that property.'    Clayton says, 'No, I don't feel able.'    She still insisted on him to buy it.    She says, 'now I want to make or give you as a present $2,000 on the property.'    She meant to buy it and repair it and all.    Clayton says, 'No, I will not accept of that for it is too much.'    She says, 'I will make you a present of $1,500, and I want you to accept it,' and Clayton accepted the $1,500 as a gift from Mary.    She brought her bank book down, and says to Clayton, 'I want you to check $1,500 from the bank to pay on the property which is yours.' She says to me, 'Celia, you go along to the bank and see that he gets it,' and Clayton drew up the check for $1,500.    He turned round and says to me, 'Now you see it is all right,' and I says 'Yes.'    He took the bank book to his house and

showed Mary the transaction.   She says, 'Now I am satisfied, and I suppose I can make my home with you as long as I live.'   Clayton says, 'Yes, so long as I have a roof over my head will I see to you while I live,' and he did."    ⟋

The property was purchased by defendant for $1,741, of which amount $1,500 was the proceeds of the $1,500 check of Mary, and it appears from the bank account of Mary that she had at that time only $1,855 to her credit.   It also appears from Hester Zimmerman's account that when this check was given, Mary said she would take the rent of the Taylor house, $60 a year, and that this rent was accordingly paid her ·from March 29th, 1897, until May, 1904, when she refused to receive it any longer, saying she felt she was then a burden upon Clayton, having before that become unable to work, and having ceased to work for wages.   The rent of this house it appears was collected by this witness from the various tenants and by her paid to Mary until 1904, when she refused to receive it, and directed witness to hand it to the defendant, which she did.

The only other person present at the time of the principal transaction was the defendant's wife, Mary B. Zimmerman, who is called Beattie in the testimony, and will be so designated here.   She testified that she was married in 1888 and that Mary came from old Mr. Zimmerman's to live in her husband's family in 1889; that from the time she first knew Mary, "she was like a mother to him, more of a mother I always thought than his own; that even after we were married she laid out the clothes he was to wear, and seen after him as a mother would until these late years when she was not able, * * she done for our children same as a mother would; she corrected them and done more for them than I did.   I always treated her as a mother, and went to her about things, and asked her how to do."

She said that after the consistory of the church refused to take the Taylor property which he had bought for them at their request, that he and Mary had a talk over the matter. "He said he did not feel like holding it.   She asked him if

she could make her home with him as long as she lived, and he said in answer, 'as long as I have a roof over my head it shall be your home.' She then wanted to make him a present of $2,000, and he said his health was so bad he did not feel like taking it, that he might be called off before she was, and she would not have enough left to bury her; and she said then, 'I will make you another offer of $1,500 which I want you to accept,' which he did." She then asked Hester Zimmerman to go with him to the bank, which she did, and when they returned he gave her back the bank book, and she looked in it and said, "she was glad he had it; it was with them she had made it, and it was with them she wanted it to stay." Both Hester Zimmerman and Beattie were subjected to long and searching cross-examination, and while there was some confusion on the part of both as to some minor matters, there was nothing to justify the rejection of their account of the transaction in question. Their testimony upon this point is corroborated by the testimony of George West to whom we have already referred. He said that sometime during the summer of 1904 when there was no one present but Mary and himself, she told him she was getting old and helpless and was going to make her home with Mr. Zimmerman the balance of her days without working; "that he had promised to care for her, that she had raised him from a child up, and the most she had was made in the Zimmerman family; that she had *given* him the best part of her money and if she lived long enough she expected for him to have it all; that they were the only ones that had cared for her."

In the fall of 1904, the defendant having recently purchased the Cramer farm, Hester Zimmerman testified that Mary looked across the fields towards that farm and said, "I am so glad Clayton has bought that farm; now I am going to make him a present of the balance of my money." Beattie Zimmerman also said that after the purchase of that farm Mary said, "she had given him part of her money, and when he settled for the farm she was going to give him the rest of it, and then Mr. Zimmerman was going to provide for her in his will."

If these three witnesses have told the truth about this transaction as we have stated their testimony, the transaction was a gift and not a loan.   None of them were impeached nor is there anything in the record to cast suspicion upon their truthfulness.   The learned Judges of the Court below in the opinion filed, referred to "the eminent respectability of the lady witnesses for the defendant, the one his sister, and the other his wife," and the simple truthfulness of the colored man, West, is transparent.   Upon their testimony the Court below declared the transaction to be a gift, and in this conclusion we fully concur.   That Court however held that because the defendant was the confidential agent of the donor; the gift, under what was stated to be the established doctrine of the English cases, must be struck down, because the donor had no independent advice, though it conceded that this Court of Appeals has never yet gone so far as the English cases.   The Court said that "for the peace of the community and the lessening of perjury, the doctrine announced in the English cases should prevail, where there is a gift involving a considerable part of the donor's estate, as in the present case."

The only question remaining therefore in the case is whether a gift *from a principal to an agent*, satisfactorily appearing to be the uninfluenced, deliberate, and intelligent act of the donor is to be held void merely because the donor had not independent advice.

In none of the Courts in the United States is greater deference and respect paid to the decisions of the English Courts than in those of Maryland.   The greater part of our people still trace their ancestry to England, in spite of the flood of immigrants from other countries which for three-quarters of a century have been infusing new strains into the population of the country.   The names of our counties and towns are redolent of English history.   Our institutions are founded upon those of England.   We have adhered tenaciously to the principles of the common law, and most of our departures from it have been adaptations of English Judicature Acts.

But we do not think an examination of the English cases will sustain the broad and unqualified statement that the English cases lay down this hard and fast rule, nor do we feel, if they did, that we should be bound by it now, unless our own Court had already adopted it.  The two cases cited by the Court below to illustrate and sustain the English rule are *Liles* v. *Terry*, L. R. 2 Q. B. 679, and *Rhodes* v. *Bate and Coddrington*, 1 Ch. App. 252.

In the latter, the facts were that Miss Rhodes was a maiden lady of fifty who resided with her brother-in-law, Rev. Henry Coddrington.   Soon after she went to live with him she lent him £200 to purchase land adjoining his house.   Coddrington was a speculator in land and employed Bate, a conveyancer, from whom he borrowed money to carry on his speculations.   *Bate was also the professional adviser of Miss Rhodes.* From time to time she became surety for Coddrington to Bate until the amount reached nearly £4,000.   On a bill filed against Coddrington and Bate, LORD JUSTICE TURNER set aside these securities as obtained by undue influence, holding it was a well settled rule of equity that *such a gift* could not be supported unless the donor had competent and independent advice in making it.

In *Liles* v. *Terry*, the client of a solicitor, without independent advice, made a voluntary conveyance to him of leasehold premises in trust for herself for life, and after her death in trust for his wife who was her niece, for her separate use. The conveyance was set aside, LORD ESHER, Master of the Rolls, saying, "It appears to me that there is in such a case a rule of equity that there is a legal presumption of undue influence *by the solicitor* which cannot be met or rebutted by any evidence, as laid down in *Rhodes* v. *Bates*.   I must submit to that rule.   I own I think it unfortunate that such a rule should have been laid down, because in particular instances it may work great injustice, and I do not think that a hard and fast rule which may work such injustice ought to be the rule of law in the matter."

LORD JUSTICE LOPES, affirming this decision, differed from

the views of the Master on the policy of the rule, declaring "that while one person is under *the influence, or presumed in fluence of another* person in consequence of a confidential relation between them, that other person cannot accept from him a gift of any kind unless it is shown to have been made with competent independent advice, which I take to mean independent advice of a professional nature. * * * That rule applies to cases of trustee and *cestui que trust*, guardian and ward, and *pre-eminently to that of solicitor and client*, who is necessarily so much under the influence of his solicitor. He knows the rule on the subject, and ought to inform his client that he should not act without independent advice."

We apprehend that these cases, upon their peculiar facts, would have been decided in the same way in the Courts of this State. Both of them illustrate the relation of *solicitor and client*, and in no way involve or refer to the relation of principal and agent.

The case of *Hunter* v. *Atkins*, 3 Mylne & Keene 113, deals with the case of principal and agent, and may be taken as a leading English case upon this subject. Hunter was a retired admiral, ninety years of age, with no children of his own, but with a wife and adopted daughter. Atkins was his banker and agent. Roberts was Atkin's solicitor. He was introduced to the admiral by Atkins' clerk, and by the admiral's direction, drew a deed, executed by the admiral, conveying to himself and Atkins certain annuities of the value of £900 in trust to pay the interest to Hunter for life with power to dispose as he should appoint, and in default of such appointment, on his death to pay £130 annually to his wife for life, and as to the residue in trust for Atkins. This conveyance, after Hunter's death, was held void by SIR JOHN LEACH because sufficient protection was not thrown around Hunter, but it was upheld on appeal. LORD BROUGHAM said in that case, ''Unless the circumstances of the transaction are such as to make it void upon the ground of fraud or undue influence, the right of the admiral to select the objects of his bounty, and of Atkins to receive his share of it, is incontrovertible, and

the Court cannot interfere.   If Atkins did stand in a confidential relation to Hunter, then the party seeking to set aside the deed may not be called on to show direct fraud, but he must satisfy the Court by the circumstances that some advantage was taken of the confidential relation in which Atkins stood.   If he stood in any of the known relations of guardian and ward, attorney and client, trustee and *cestui que trust*, then, in order to support the deed, he ought to show that no such advantage was taken, and that all was fair.   \*   \*   \*  No law that is tolerable among civilized men can ever forbid such a transaction, a gift from a client to a valued attorney, provided he be of sound mind, and there is nothing to show that deception was practiced, or that the attorney availed himself of his situation to withhold knowledge or exercise any influence advantageous to himself.   This appears to me a much more intelligible and sound principle than that referred to by the Master of the Rolls in his judgment, and which in cases of this description you will sometimes see alluded to, that a third person ought to be interposed.   I say, you will see alluded to, for I can nowhere find it established as a rule." Referring to *Griffiths* v. *Robins*, 3 Maddock, 191, which was the ground of the Master's judgment, the Chancellor said, "It is quite clear that he uses this as *one* obvious test of that which we seek in all these cases, viz., the proof of a voluntary or deliberate act, and not as the *only way* in which the deed can be shown to be of that description.   To hold the contrary would be to say that the law will not allow a person dependent upon another for comfortable existence, to show his gratitude towards him in the disposal of his property; in other words to deprive such a person of a power over his property, whom it most of all imports to possess and use that power of disposal.   In no other case has anything of the kind been laid down and I am of the opinion that it is not laid down, even in *Griffiths* v. *Robins* unless you take the letter of the judgment against its plain meaning."

Even in the case of *Liles* v. *Terry*, *supra*, the Court emphasises the fiduciary relation of trustee and *cestui que trust*,

guardian and ward, and solicitor and client, by reason of the presumed influence af the trustee, guardian, or solicitor, as the ground for the application of the rule as to independent advice, and does not allude in that connection to the case of principal and agent. The significance of this omission is well explained in *Thornton on Gifts and Advances*, sec. 456, in which the author says, "In the case of principal and agent there is no adverse presumption arising from implied control or dominion by one over the will of another, though their dealings are to be closely scrutinized. *In this relation confidence alone exists, while dominion is not implied.* In the matter of dealing between agent and principal, the agent must show that *he gave* the same disinterested advice in the matter as an independent adviser would have done, but not so in the case of a gift. He is not an agent for the purpose of taking a gift, or for dealing with the subject matter of the agency *in that manner*, * * *. Something more than mere agency must be shown before the gift can be overturned. In such an instance, it is not necessary to show that the principal had independent advice." This view of the law is supported by Mr. Pomeroy in his work on *Equitable Jurisprudence*, vol. 2, par. 959, note 1, p. 1389, in which it is said, "The equitable rule concerning gifts between principal and agent does not seem to be so stringent as that which regulates the similar dealings of trustees and their beneficiaries."

It is also supported by adjudged cases of high authority. In *Uhlich* v. *Muhlke*, 61 Ill. 499, the Court said: "A gift from one to another who has been for many years his confidential agent and adviser, is valid, unless the party who seeks to set it aside can show that some advantage was taken by the agent of the relation in which he stood to the donor. The suspicion arising from the confidential relation may be removed, and it is only necessary to show, *either* that the party had competent and disinterested advice, *or* that he performed the act voluntarily and deliberately, knowing its nature, and that his consent was not obtained by reason of any influence supposed to grow out of the relation. No reported case goes to the ex-

tent of saying that by force of such relation a deed is *ipso facto* void.    If such was the rule, a grateful man to whom important services had been rendered would be prohibited from giving any testimonial of his gratitude to the other.    Kindness, important services, and friendship to the distressed would be under a legal ban.    A man in the full possession of his faculties would be prevented from giving any portion of his large estate to one by whose advice and counsel it had been rescued from ruin."    This case is characterized in a valuable note to the case of *Ralston* v. *Turpin*, 25 Fed. Rep. 7, as the leading American case on this subject.    The doctrine of *Uhlich* v. *Muhlke*, was held in *Ralston* v. *Turpin*, and the decision in the latter case was affirmed in 129 U. S. 663.    The note above referred to is a valuable exposition of the law on this subject, the result of the authorities being stated thus.    "In case of a gift by a person sustaining any relation in which *dominion* is implied, there is a presumption of law against its validity.    In the case of a gift by a principal to an agent the *onus* is on the party assailing it."

In *Decker* v. *Waterman*, 67 Barb. 460, the relation of principal and agent was in fact and in law established between Mrs. Decker and Waterman, and the gift was upheld though made without independent advice.    The Court said.    "I am fully convinced that if this gift to Waterman had been embraced in the will that day executed by her, as a bequest to him, and such will had been left by the testator to stand, and the same were offered for probate on the proof here made, no Court would reject the same on the ground that the devisee procured the same by fraud or the exercise of undue influence over the testator; and I am unable to see why a gift *inter vivos* made under like circumstances can not be upheld as against those claiming by inheritance."

The case of *Pressly* v. *Kemp*, 16 So. Ca. 334, is similar to *Decker* v. *Waterman*, and the Court, in a well reasoned opinion, held there was no distinction in this respect between a gift by will, and a gift *inter vivos*.

The note above referred to in *Ralston* v. *Turpin*, points out

that while LORD ELDON applied the rule as to independent advice in *Huguenin* v. *Basely*, 14 Vesey, 300, which was the case of a gift to a clergyman, where spiritual ascendency may well be presumed, he himself practically recognized the distinction between that case and the case of an agent, by applying to the latter a different rule in the case of *Harris* v. *Tremenhere*, 15 Vesey, Jr. 34    It being conceded that this Court has never gone so far as to declare such a gift void without independent advice it will not be necessary to review the cases referred to by the Court below in its opinion, viz: *Brooke* v. *Berry*, 2 Gill. 83; *Highberger* v. *Stiffler*, 21 Md. 338; *Todd* v. *Grove*, 33 Md. 195; *Whitridge* v. *Whitridge*, 76 Md. 54, and *Zimmerman* v. *Bitner*, 79 Md. 115.    It may be observed however that in *Brooke* v. *Berry*, the extent to which the Court went was to declare that "gifts procured by agents and purchases made by them from their principals should be scrutinized with a close and vigilant suspicion."

In *Highberger* v. *Stiffler*, the Court said, "Whatever view we take of the evidence, whether the relation between the grantor and grantee was that of principal and agent, trustee and *cestui qui trust*, or *quasi* guardian and ward, the confidence reposed *and the influence acquired*, were such as to compel a Court of equity to declare a deed executed under the circumstances proved, improvident and voidable at the option of the grantor."

In *Todd* v. *Grove*, JUDGE MILLER reviewed the authorities (including *Rhodes* v. *Bate*) at length, and referring to the rule of independent advice, said, "Without expressing any decided opinion as to its correctness, we yet think it would operate too great a restraint upon the disposition of property, to make almost every gift to a person holding a confidential relation, void, merely because not made with the aid of competent and independent advice;" and later in the same opinion cited with approval the case of *Gibson* v. *Russell*, 2 Y. & C. 115, holding that in such cases "it is incumbent on the defendant to show that when the gift was made, the donor was of sound mind, in all material respects competent to the transaction of such business, that he well understood the matter, *and needed* no other advice or assistance respecting it than such as he had."

This is generally regarded as the leading Maryland case on this subject, and it is unnecessary to refer to others.

The proof in the case before us measures fully up to the requirements above stated, and as was said in *Hunter* v. *Atkins, supra*, "If on such grounds a deed so prepared and executed is to be set aside, few, assuredly of the acts of men dealing with their own affairs, are safe, and the law which enables all who are of sound mind to dispose of their property no longer exists but in name."

The decree appealed from will be reversed for the reasons stated.

> *Decree reversed with costs to the appellant above and below, and bill dismissed.*