MARY A. FARMER *v.* PETER J. O'CARROLL et al.
[No. 56, January Term, 1932.]

*Decided April 27th, 1932.*

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Isaac Lobe Straus,* with whom was *J. Paul Schmidl,* on the brief, for the appellant.

*J. Irvin McCourt* and *Edward L. Ward,* with whom were *Galvin & McCourt* on the brief, for the appellees.

434

PARKE, J., delivered the opinion of the Court.

The original bill of complaint in the cause now at bar was filed in Circuit Court No. 2 of Baltimore City by Mary A. Farmer against the Reverend Father Peter J. O'Carroll, individually, and as former treasurer, and now assistant treasurer, of the Associated Professors of Loyola College in the City of Baltimore, a body corporate, and the Associated Professors of Loyola College in the City of Baltimore, a body corporate. The chancellor sustained a demurrer to the bill of complaint on the grounds that the bill was multifarious and did not show an equity in the plaintiff, but granted the plaintiff leave to amend. Within the prescribed time, an amended bill of complaint was filed by the plaintiff against the same defendants, with the single exception that the Reverend Father Peter J. O'Carroll was sued as former treasurer, and now assistant treasurer, of the Associated Professors of Loyola College in the City of Baltimore, and not in his individual capacity. A demurrer was again interposed and sustained, with leave to the plaintiff to amend within ten days, and the plaintiff did not so amend, but entered an appeal from the order sustaining the demurrer.

The bill of complaint is prolix and redundant, and, when stated in terms of its substance, seeks relief in equity on the following allegations, which must be accepted as true on demurrer, to the extent that they are well pleaded: The plaintiff is a spinster and was about fifty-three years old in 1921, when the transaction of which she now complains was made. She then had an estate of about $180,000, that was almost entirely in the form of bonds, securities, money, and other personalty, although it embraced real and leasehold property. This estate came to her in part by will and in part under the statutes of descent and distribution, and it was the "definite and settled desire, intent and expectation of the plaintiff that her estate should go to her nieces and nephews," the four children of her dead brother, James F. Farmer, who were the only other surviving members of the family from which she had derived her property, in the period, principally, between 1917 and 1921.

The Associated Professors of Loyola College in the City of Baltimore is a body corporate of the State of Maryland, whose corporate associators are priests of the Roman Catholic Church and members of the order known as the Society of Jesus. The corporate purpose is to conduct an educational institution, although its members are engaged in various religious, spiritual, and eleemosynary enterprises and charities, and have the management and control of the property known as St. Ignatius Church, at the corner of Madison and Calvert Streets in Baltimore City. From 1908 to 1924 the Reverend Father Peter J. O'Carroll had been the treasurer of the corporation, and then became its assistant treasurer, a post which he has continuously held to the present; and throughout this period he has been one of the officiating priests of St. Ignatius Church.

The bill of complaint further alleged that the plaintiff is a devout Catholic, and has been a member of the congregation worshipping at St. Ignatius Church for thirty-three years before the institution of this suit in the fall of 1931; and that Father O'Carroll has been her confessor and spiritual adviser for the last twelve of these years, and the plaintiff's surviving sister, Margaret Farmer, died in the latter part of September, 1920, and after her death Father O'Carroll gained her confidence and became her business, as well as her spiritual adviser, and "acquired a controlling influence and dominion over her mind."

The gravamen of the bill of complaint is contained in the following lengthy excerpt:

"The plaintiff, being then well past middle age, and living entirely alone, and having been greatly shocked and overcome, weakened and debilitated in mind and body and in an extremely depressed and nervous condition, as the result of the death of her sister Margaret, became easily subject to the undue and dominating influence, and ascendancy of the said Reverend Father O'Carroll, who, being Treasurer and member of the said Associated Professors of Loyola College in the City of Baltimore, in his priestly office and as her

father confessor and spiritual adviser, represented himself as acting solely for the benefit and in the interest of the plaintiff. By the exercise of his said controlling and dominant influence over the plaintiff, whereby he prevailed upon her all the more easily and effectively because of her then distracted, depressed, nervous and weakened condition aforesaid, and also as the result of the said representations and importunities of the said Reverend Father O'Carroll, to the effect that his interposition and advice were solely for the benefit and in the interest of the plaintiff and for the preservation and betterment of her property and estate, as well as for her spiritual benefit and welfare, and were without any selfish or ulterior motive upon his part, the said Reverend Father Peter J. O'Carroll, being then as aforesaid, an officiating priest of the said St. Ignatius Church, of which the plaintiff was then a member and communicant, and the father confessor and spiritual adviser of the plaintiff and being at the same time the Treasurer and Executive Officer, and acting as the representative and agent, and in the interest of the defendant, The Associated Professors of Loyola College in the City of Baltimore, in possession, charge, control and direction of said Saint Ignatius Church at said Calvert and Madison Streets in Baltimore City as aforesaid, on April 20, 1921, influenced and prevailed upon the plaintiff to deliver to him for the said defendant, The Associated Professors of Loyola College in the City of Baltimore, one hundred and thirty-five thousand, three hundred and fifty ($135,350.00) dollars in United States of America Liberty Loan bonds, $4\frac{1}{4}\%$; and at or about the same time also to deliver to him for the said defendant, The Associated Professors of Loyola College in the City of Baltimore, the further sum of twenty thousand ($20,-000.00) dollars in United States of America Liberty Loan bonds, $4\frac{1}{4}\%$; which said transactions and deliveries the said Reverend Father O'Carroll, acting in the capacities and in the manner and for the purposes and to the ends aforesaid, wrongfully and falsely in-

formed and led the plaintiff to believe were merely a loan and that said bonds were returnable and would be returned to her upon her request, the interest maturing upon said bonds to be paid to her as long as the plaintiff should allow said alleged loan to continue, and the said bonds to remain the property of and belong to the plaintiff; the said Reverend Father O'Carroll, then and there acting in the capacities, in the manner and for the purposes and to the ends aforesaid, wrongfully and fraudulently induced, procured, directed and prevailed on the plaintiff to sign a paper writing, dated April 20, 1921, by taking unfair, improper and wrongful advantage of the plaintiff and of her trust, faith and confidence in him, as aforesaid, as her spiritual adviser and father confessor, and as her business adviser, as aforesaid; and also by undue influence exercised by the said Father O'Carroll, acting in the capacities and in the manner and for the purposes and ends aforesaid, upon and over the plaintiff; and also, by actual deception and fraud, consisting of the false and fraudulent misrepresentation, made by the said Father O'Carroll, acting in the capacities aforesaid, and in the manner, and for the purposes and to the ends aforesaid, to the plaintiff, that the purport, meaning and effect of said paper writing, dated April 20, 1921, were that the delivery of the bonds, referred to in said paper writing, was and constituted merely a loan of said bonds, and that said bonds were returnable and would be returned to her upon her request, the interest maturing upon said bonds to be paid to her as long as she should allow said alleged loan to continue, and the bonds to remain the property of and belong to the plaintiff, which said paper writing the plaintiff signed at and upon the said advice, direction and behest, and upon and relying upon the said representations aforesaid, of said Reverend Father O'Carroll, acting in, all and singular, the capacities and respects aforesaid, and implicitly relying upon and trusting him as her spiritual adviser and confessor, and having absolute faith and confidence in and implicitly relying in his priestly

438

office and the disinterested and devoted motives professed by him, in her behalf, and without deeming it proper or appropriate to read, and, so as aforesaid, relying and trusting, without reading, the said paper writing in order to verify said representations and professions of her said spiritual adviser and religious confessor, and without any other or independent advice or information whatsoever."

A purported copy of the above-mentioned instrument of writing is filed as an exhibit to the bill of complaint and is as follows:

"In consideration of the agreement by The Associated Professors of Loyola College in the City of Baltimore, a body corporate of the State of Maryland, to pay to the undersigned Mary A. Farmer, the sum of money hereafter set forth, the said Mary A. Farmer doth hereby assign and transfer to The Associated Professors of Loyola College in the City of Baltimore, its successors and assigns, absolutely, one hundred and thirty-five thousand and three hundred and fifty dollars of United States of America Liberty Loans Four and One-quarter per cent. bonds with interest coupons hereafter maturing thereto attached, and in consideration of the assignment and transfer of the above-mentioned bonds with said coupons to The Associated Professors of Loyola College in the City of Baltimore by the said Mary A. Farmer, The Associated Professors of Loyola College in the City of Baltimore hereby agrees to pay to the said Mary A. Farmer interest in said principal sum of one hundred and thirty-five thousand three hundred and fifty dollars at the rate of four and one-quarter per cent. per annum during the lifetime of said Mary A. Farmer, said interest accounting from the date when the interest coupon on said bonds was last payable by the United States of America to the holder of said bonds, and said interest being payable in semi-annual installments accounting from said last-mentioned date, and upon the death of the said Mary A. Farmer, said interest payments shall abso-

lutely cease, and no sum of money shall thereafter be due to the said Mary A. Farmer or to the estate of the said Mary A. Farmer hereunder.

"Witness the hand and seal of the said Mary A. Farmer and the seal of The Associated Professors of Loyola College in the City of Baltimore, and the signature of its President, this twentieth day of April, A. D. nineteen hundred and twenty-one.

"Mary A. Farmer. (Seal)

Joseph A. McKehenay, S. J.,

"President Loyola College. (Seal)

"Witness: Peter J. O'Carroll, S. J."

The remaining averments which require statement may well be thus summarized: The bonds, constituting much more than the major portion of her estate, were delivered, through Father O'Carroll, to the corporation, and thereafter the corporation has paid to the plaintiff the interest on the principal amount of the bonds at the annual rate of four and one-quarter per cent., and the plaintiff has deducted from her income the interest so received as being a proper allowance in the computation of the yearly federal income tax payable by her. This situation continued until shortly after June 5th, 1930, when the plaintiff, who lived alone in her home, met with a severe accident and lay unconscious and without assistance until she was discovered by a servant, who notified a woman friend of the plaintiff. This friend summoned the plaintiff's physician, who removed the plaintiff to the hospital, and notified Father O'Carroll. The priest and the friend took possession and charge of the house and effects of the plaintiff, but the nephews and nieces, although known, were not notified by the priest, who is alleged to have had the plaintiff entered at the hospital as having no living relatives, and to have given the name of the friend as the person to be notified in the event of the death of the plaintiff, whose doctor was, at first, of the opinion she could not live more than two days. The bill of complaint further alleged that, while the plaintiff was unconscious at the hospital, the friend and the priest went to the residence of the plaintiff and took

into custody all her personal property, including "bank books, check books, memorandum papers, and records, and tore and cut from the plaintiff's memorandum books and books of account all pages containing any writing or memorandum, and destroyed all the plaintiff's books of account and entry wherein she kept any records or entries referring to her property and possessions, and particularly to the said bonds." About $7,000 in money was found in the house, and Father O'Carroll gave $1,000 to the friend for the expenses of the plaintiff at the hospital, and the residue he deposited in a banking institution in his name as agent for the plaintiff.

The nephews and nieces of the plaintiff were informed, on June 10th, 1930, by third parties, that the plaintiff was ill in the hospital, and they went to see her and took charge of her affairs. They inquired by what authority the friend had assumed possession of certain personal property, and she stated that she was the agent of Father O'Carroll, and he declared that he had acted as agent of the plaintiff. After the plaintiff had recovered sufficiently, she directed her nephew James Q. Farmer, an attorney at law, to take full charge of her affairs and gave him a general power of attorney. The friend and the priest, on demand, accounted for and delivered to the nephew the personal property and money of which they had assumed the custody on the happening of the accident to Miss Farmer.

The bill of complaint further charges that on May 26th, 1931, Father O'Carroll called upon the plaintiff, when the nephew, who had been given the general power of attorney, was present, and the plaintiff demanded of the priest the return of the money represented by the par value of the bonds, and he declared that she had given it, and had executed a paper writing, and referred him to an attorney, who, after demand and delay, gave him a copy, which was filed with the bill of complaint and which has been inserted in this opinion. The instrument mentioned referred to bonds in the amount of $135,350, but there remained bonds, which were not embraced in this contract, in the sum of $20,000,

as was indicated by the interest paid by the corporation to the plaintiff. Demand was made of the defendants for the return of the aforesaid Liberty bonds, or the amount or value thereof, or to account for the same to the plaintiff.

On these allegations, the plaintiff has prayed: (1) That the transfer and delivery on April 20th, 1921, by the plaintiff to the defendants, or either of them, of United States Liberty bonds to the amount of $135,350; and the paper writing of that date in reference thereto; and the transfer and delivery by the plaintiff to the defendant, or either of them, of other such bonds to the amount of $20,000, be declared null and void; and that the said Father O'Carroll, as treasurer and assistant treasurer of the corporation, and the said corporation, shall be required by decree to deliver, return, and restore to the plaintiff the said Liberty bonds, aggregating $155,350, with all unpaid interest which may have accrued from the time of their delivery to the defendants to the date of the decree. (2) That all other transactions and transfers of bonds or other things of value by the plaintiff to the defendants be discovered and avoided, and required to be returned and restored to the plaintiff. (3) That the defendants account to the plaintiff for all the Liberty bonds mentioned and for all other property of the plaintiff of which the defendants received and assumed, and retain, possession. (4) That the defendants make discovery under oath of all matters, facts, and things whereby they have knowledge relating to or bearing upon the aforesaid Liberty bonds and any other property whatsoever paid, transferred, and delivered by the said plaintiff from, and including, the year 1921, to the time of the filing of the bill of complaint. And (5) that the plaintiff may have any other and further relief as her case may require.

On the assumption that these allegations are true, the bill of complaint has reference to two subject-matters. The first is one combination of Liberty bonds whose aggregate par value is $135,350. The second is another combination of Liberty bonds having a total par value of $20,000. The two subject-matters of controversy have this in common, that

their respective legal status was determined when they were severally delivered by the plaintiff to the treasurer of the corporation, and not by the acts of Father O'Carroll in respect to his assumption of temporary possession of other property of the plaintiff on the occasion of her accident of June 5th, 1930. His conduct at that time cannot, on the averments of the bill, be imputed to the corporation, but must be regarded as having been done upon his own initiative and personal responsibility. Aside from the alleged spoliation or destruction of the plaintiff's memorandum books and of account and entry, Father O'Carroll's assumption of care and custody of the money and valuable personalty in the unoccupied residence are consistent with the purpose to protect and conserve property which, under the circumstances, was susceptible to loss during the enforced absence of its owner. So, ignoring the immaterial, the well-pleaded averments will now be considered with regard to their sufficiency to disclose an equity in the plaintiff in respect to each subject-matter, and this method will present the substantial points of difference.

1. Taking the less valuable combination of Liberty bonds first, the charge is made that they were delivered by the plaintiff to the defendant corporation, through their receipt by its treasurer, upon the understanding that the bonds would remain her property, and would be returnable, and would be returned to her, upon her request, and that the interest accruing due on these specific bonds would be paid to the plaintiff so long as she should not demand their return. The pleader terms this transaction a "loan," but it cannot be in the sense of the creation of the relation of debtor and creditor, since, while possession passed, there was no transfer of title, and the bonds must be specifically returned, and it was not contemplated by the parties that the corporation was at liberty to return either money or other bonds of similar issue. The contract resulting was a bailment (a), and not a trust, nor did there arise such a fiduciary relation between the parties as would give a court of equity jurisdiction. A conversion by the bailee of the bonds and the interest gives the

plaintiff a right of action at law for the tort or for breach of the contract of bailment, but equity would not have jurisdiction (b).

(a) *Van Zile on Bailment* (2nd Ed.), secs. 12, 17, 50, 79, 82; *Story's Bailment,* sec. 99; *Schermer v. Neurath,* 54 Md. 491; *Levi v. Booth,* 58 Md. 305.

(b) 6 *C. J.,* secs. 118-125, pp. 1152, 1153; *Maury and Osbourn v. Coyle,* 34 Md. 235; *Third National Bank v. Boyd,* 44 Md. 47; *Pessagno v. Salabes,* 159 Md. 476, 150 A. 866; *Bullen & Leake, Prec. of Pleadings* (3rd Ed. 1868), p. 90, citing *Owen v. Routh,* 14 C. B. 327; *Deacon v. Gridley,* 15 C. B. 295, 139 Eng. Rep., p. 134 and p. 436; *Lemnos etc. Works v. Spiegelberg,* 127 Misc. Rep. 855, 217 N. Y. S. 595. *Young v. Mercantile Trust Co.* (C. C.), 140 Fed. 61, affirmed (C. C. A.), 145 Fed. 39; *Taylor v. Turner,* 87 Ill. 296; *Tennessee Packing etc. Co. v. Fitzgerald,* 140 Ill. App. 430.

Under the allegations of the bill of complaint and plaintiff's theory of the case, the defendant Father O'Carroll acted strictly in conformity with the terms of the contract when he received the Liberty bonds of the par value of $20,000 from the plaintiff and delivered them to the corporate defendant. Consequently, he was thereby guilty of no wrong, nor did he commit any breach of contract, and he is, therefore, not shown to be liable in any forum whatsoever to the plaintiff in respect to the smaller combination of bonds. If there has been any breach either of duty or of contract, it was by the defendant corporation, and, as has been stated, the remedy is at law and not in equity. *Supra.*

2. The first and larger combination of Liberty bonds is averred by the plaintiff to have been a bailment upon terms identical with those upon which the second and smaller combination of Liberty bonds was deposited with the corporate defendant. The vital difference, however, in the two questions is caused by the plaintiff's admission of her contemporaneous execution and delivery of a paper writing, which is a complete negation of the parol contract of bailment alleged. The plaintiff admits the execution and delivery of this docu-

ment under seal, and is, therefore, without a cause of action or suit unless she can establish the document to be voidable. The plaintiff undertakes to have this instrument declared void and rescinded on the ground of both actual and constructive fraud, which is peculiarly a matter within the jurisdiction of a court of equity. The allegations of the bill are principally addressed to this particular complaint.

The *actual* fraud averred is that the treasurer of the defendant corporation fraudulently procured the execution and delivery by her of the document in question by representing falsely to her that it was a contract of bailment, whereby she merely loaned to the defendant corporation certain Liberty bonds in the aggregate sum of $135,350, which were to be specifically returned to her on her request and, meanwhile, the interest, as it accrued due thereon, would be collected and paid by the defendant corporation to the plaintiff. The *constructive* fraud relied upon is that Father O'Carroll was the spiritual and business adviser of the plaintiff before, when, and after the document in question was executed and delivered by the plaintiff. This relation of spiritual adviser and a member of his congregation is generally regarded as of a confidential nature, and is, therefore, within the principle of equity that where persons are shown to stand in a confidential relation towards each other, one seeking relief has not to prove actual fraud or coercion was employed in the gift, grant, contract, conveyance, or transfer of property, since the burden of proof falls upon the party so benefited to establish that the power conferred by the relation was not abused. *Zimmerman v. Frushour,* 108 Md. 115, 127, 128, 69 A. 796; *Williams v. Williams,* 63 Md. 371, 400; *Whitridge v. Whitridge,* 76 Md. 54, 73, 24 A. 645; *Kensett v. Safe Dep. & Trust Co.,* 116 Md. 526, 531, 82 A. 981; *Allcard v. Skinner,* L. R. 36 Ch. D. 145; *Bispham's Principles of Equity* (8th Ed.), sec. 237; *Pomeroy's Eq. Juris.* (4th Ed.), sec. 963; 1 *Bigelow on Fraud,* p. 352. To discharge this burden, it must be made clear, not simply that the donor, grantor, or contracting party knew the effect of his action, but that he, under no sort of undue influence,

had either competent and disinterested advice, or had performed a not unreasonable act with knowledge of its nature and as the result of the free exercise of independent will. *Zimmerman v. Frushour,* 108 Md. 115, 126, 69 A. 796; *Taylor v. Pivec,* 149 Md. 526, 532, 131 A. 757; *Todd v. Grove,* 33 Md. 188, 194-195; *Inche Noriah v. Shaik Allie Bin Omar* (1929), A. C. 127, 135 (P. C.); *Bispham's Equity* (8th Ed.), sec. 237.

It will be observed that the principle is stated as applicable not only to gifts but also to contracts and conveyances for valuable consideration, because, as a general rule, relief will be afforded in equity in all transactions in which "influence has been acquired and abused, in which confidence has been reposed and betrayed." *Smith v. Kay,* 7 H. L. Cas. 750, 771; *Bispham's Principles of Equity* (8th Ed.), secs. 231, 232; *Pomeroy's Eq. Juris.* (4th Ed.), 957; *Halsbury's Laws of England,* vol. 15, sec. 204, p. 104; *Wright v. Carter* [1903], 1 Ch. 27, 50.

Furthermore, the defendant corporation is not a third person, but a party to the transaction. The priest who is accused of the wilful misrepresentation of the nature of the paper writing, and who is alleged to have been the spiritual and business adviser of the plaintiff, was also a member of the defendant corporation and its treasurer, and agent in the transaction between the plaintiff and the defendant corporation. On the averments of this bill of complaint, the defendant corporation or principal is innocent of the fraud charged. Nevertheless, if, as here sufficiently alleged, the false, fraudulent, and material representations were made by its agent beyond and in direct opposition to his express authority, but while the agent was purporting to act, and did act, on behalf of the principal in the negotiation of the contract by virtue of his apparent authority as agent in the course of the business delegated to him and in connection therewith, the principal is responsible, unless the misrepresentations are so unreasonable that a reasonably prudent man would not rely upon them. 2 *Mechem on Agency* (2nd Ed.),

secs. 1984, 1985, 1987, 1993; *Williston on Contracts,* sec. 1518.

While the plaintiff was a layman, yet she was lettered, and so would have known, if she had read, the nature and effect of the clear and simple document which she signed. Ordinarily a failure to read before executing a document of importance to the subscriber is unjustifiable reliance. However, it is alleged that the misrepresentation of the actual contents and effect of the instrument was what caused the plaintiff not to use the means of knowledge within her power, and that vigilance was not exercised because of the natural trust and confidence she reposed in the party who, on the demurrer, must be accepted as guilty of the deceit. Under these circumstances, one who has been guilty, or is charged with the guilt of an agent, in the perpetration of a wilful fraud by inducing the other party to refrain from reading the document, should not be assured of the benefit of a deceit made possible by the defrauded party's genuine belief, although founded in stupidity or credulity. *Williston on Contracts,* sec. 1516. As the record now stands, the principal can derive no advantage from a contract which the defrauded party entered into in the full confidence that its nature and effect were in fact as misrepresented by the agent.

Nor are laches a defense on demurrer to proceedings in equity in respect to the contract in reference to the group of bonds aggregating $135,350. It is true that the contract was made about April 20th, 1921, and that ten years had passed before the plaintiff took any action. This is a long period, but the plaintiff was not bound to act until she became aware of the fraud or was informed of facts and circumstances from which such knowledge would be imputed to her. No lapse of time, nor delay in bringing a suit, will defeat the remedy, provided the injured party was, during all this interval, ignorant of the fraud, since the duty to begin proceedings does not arise until his discovery of the fraud. *Pomeroy's Equity Juris.* (4th Ed.), sec. 917. The plaintiff asserts she knew nothing of the adverse claim of title by the defendants until the year of the suit. The retention of the

bonds by the defendant corporation, and the payment of the interest in exact agreement with the rate and yield of the principal of the bonds, was in conformity with the bailment alleged by the plaintiff, and since she did not demand their return, and the document in controversy was in the possession of the defendant corporation, and had never been read by her or seen after its execution, there was nothing in the situation to give or put her on notice that the defendant corporation claimed an absolute title to the bonds. It follows that the demurrer to the bill on the ground of laches must fail, as the allegations show that the plaintiff acted promptly on the discovery of the facts charged. *Hirons v. Hubbell,* 149 Md. 593, 607, 132 A. 645; *Sears v. Barker,* 155 Md. 323, 331, 141 A. 908.

There would be no error in joining the agent and associate member of the corporation as a codefendant in an amended bill of complaint drawn upon the allegations with respect to the larger group of Liberty bonds. In equity the remedy reaches all those who were actually concerned in the fraud. *Pomeroy's Eq. Juris.* (4th Ed.), sec. 918. Even if no relief can be adjudged against him, he is properly made a defendant as additional security for the costs. *Daniell's Chan. Pl. & Pr.* (6th Am. Ed.), 296-298 (star).

Again the general rule that no one should be made a party to a cause against whom, if brought to a hearing, there can be no decree, is subject to the further exception that, under certain circumstances, the individual members of a corporation aggregate or the officers of a corporation may be made defendants. 1 *Daniell's Chan. Pl. & Pr.* (6th Am. Ed.), 144, 145, 295, 296 (star).

Father O'Carroll as agent and associate member of the defendant corporation is declared to have been the chief actor in the matters in controversy, and there will be no error in joining him as a defendant in a suitably amended bill of complaint. *Supra; Miller's Equity Proc.,* sec. 22, pp. 29, 30, sec. 55, p. 65.

Because of the joinder in the bill of complaint of one matter for which an action at law is the remedy with another

distinct matter of equitable cognizance, the decree of the lower court will be affirmed, and the cause remanded to allow plaintiff an opportunity, if desired, to amend the pending bill of complaint within such reasonable time as the chancellor shall by rule prescribe. When well amended, and the cause at issue, the chancellor will decree according to the facts established by the evidence and the controlling equitable principles.

> *Decree affirmed, with costs, and cause remanded for further proceedings in conformity with this opinion.*