76 P.2d 34

**WOODSON v. RAYNOLDS.**

No. 4308.

Supreme Court of New Mexico.

Jan. 24, 1938.

Mechem & Hannett, of Albuquerque, for appellant.

John F. Simms, J. R. Modrall, and A. T. Seymour, all of Albuquerque, for appellee.

HUDSPETH, Chief Justice.

Katherine McMillen Woodson, daughter and legatee of Alonzo B. McMillen, deceased, sued to set aside a consent judgment allowing a claim of the First National Bank of Albuquerque, N. M.,

against the estate of Alonzo B. McMillen, deceased, in the sum of $31,153.95. The judgment was assented to and approved by her, all the other heirs, and the executors some eight years before the filing of this suit. Appellee Raynolds bought the judgment in October, 1928, at face value from the bank when the comptroller objected to the judgment as a bank asset. The findings and judgment were in his favor, and plaintiff brings this appeal.

The appellee challenges seven statements of fact made in appellant's brief. The learned trial judge filed an opinion to which appellant refers for support of certain statements of fact. Where there is a conflict between an opinion and a finding of fact supported by substantial evidence, the finding prevails. After carefully examining the record, we have decided that all facts found by the court at the request of appellee are supported by substantial evidence and that it will simplify the consideration of the issues raised by this appeal to set out said findings in full. They follow:

"1. A. B. McMillen died intestate in Bernalillo County, New Mexico on the 11th of August, 1927, leaving him surviving his widow, Florence O. McMillen, and three adult married daughters, to-wit: Eileen McMillen Lee, the wife of Laurence F. Lee, Dorothy McMillen Rodey, the wife of Pearce C. Rodey; Katherine McMillen Woodson, wife of Richard P. Woodson; Dorothy McMillen Rodey has since died, leaving her surviving Sheila McMillen Rodey and Alonzo McMillen Rodey, two minor children, whose legal guardian is Pearce C. Rodey, their father;

"2. The First Savings Bank and Trust Company of Albuquerque, New Mexico, was adjudged insolvent and placed in the hands of a receiver on the 7th day of September, 1933;

"3. In the year 1922 and for many years prior thereto A. B. McMillen was a director of and attorney for the First National Bank of Albuquerque and the First Savings Bank and Trust Company of Albuquerque, and the Defendant, J. M. Raynolds was in 1922 President of both institutions and a director in each and continued so until both banks closed in 1933, and the directors in both banks were the same.

"4. In the year 1922 and prior thereto for many years J. S. Raynolds, the father of the Defendant and the founder of the banks in question, and A. B. McMillen were close personal friends and business associates and occupied positions of trust and importance with both banks, the agents, officers and servants of which were accustomed to carry out their instructions.

"5. In the year 1922 A. B. McMillen directed Guy Rogers, Vice-President of the First National Bank of Albuquerque, to purchase the outstanding bonds and stock of the Central Printing Company, which operated the Albuquerque Evening Herald, a daily newspaper, which enjoy-

ed a news-service franchise and which was then in financial difficulties, its stock having only a nominal value of approximately 10¢ a share and the bonds being purchasable at 50¢ on the dollar with interest in default.

"6. At the time Mr. McMillen directed the purchase of the stock and bonds of the Central Printing Company his purpose was to acquire and control the Herald, and, following his instructions, the First National Bank of Albuquerque bought all of the outstanding stock and bonds, delivered the stock to Mr. McMillen, and carried the bonds as a bank investment.

"7. At the time the bank bought the bonds and stock it was the understanding of the Defendant, J. M. Raynolds, that Mr. McMillen would protect the bank from loss in handling the transaction in the manner done, and Mr. Raynolds was justified from the facts and circumstances in understanding and believing that Mr. McMillen had agreed to protect the bank from loss.

"8. Mr. McMillen handled the Herald for several years at a loss around $80,-000, after which the Central Printing Company went into the hands of a receiver and the amount of the claim in controversy here, to-wit, $31,153.95, represents the sum necessary to be repaid to the First National Bank of Albuquerque to protect it from loss in the transaction.

"9. After the amount of the loss was ascertained, conversations ensued between the Defendant and McMillen, from which the Defendant sought to get McMillen to give him a guarantee in writing on account of the requirements of the national bank examiner, but McMillen did not do so, and in the late winter and early spring of 1927, when Mr. McMillen was confined at home with his last illness, Mr. Raynolds made a written demand for a settlement of the matter, which Mr. McMillen refused in writing, claiming that he never guaranteed the payment of the bonds, or the bank's loss in relation thereto.

"10. Laurence F. Lee, who was a member of the Bar of New Mexico and son-in-law of McMillen, was his partner in the last two years of his life and handled his business matters for him, at least to the extent of contacting and dealing with persons who had business with Mr. McMillen and reporting such transactions to Mr. McMillen.

"11. In the spring of 1927, before Mr. McMillen died the following August, the Defendant, J. M. Raynolds, President of the First National Bank of Albuquerque, not being able to arrive at a settlement of the disputed claim for $31,153.95, consulted H. G. Coors, an attorney, and was advised by Coors that he could hold Mr. McMillen liable for paying the bank's claim, but Mr. Laurence F. Lee was of the opinion that, if the bank sued Mr. McMillen, the claim could be defeated.

"12. In the spring of 1927, after Mr. Raynolds had stated that he was obliged to sue Mr. McMillen and intended to do so, Mr. Lee called a family conference

of Mrs. McMillen, Mrs. Lee, to meet in Lee's office, at which conference Raynolds, the Defendant, attended, stating that he had been advised by Coors, that his claim was collectible by suit and he intended to bring suit on it; Mr. Lee stated at the meeting that he would "beat the socks off the claim"; Mrs. McMillen asked Raynolds in the open meeting what would be the consequence of their refusal to agree to allow the claim after Mr. McMillen's death and was told by Mr. Raynolds that he would be obliged to sue them; the conference finally determined and agreed that, if Raynolds would not sue and thus embitter the last days of Mr. McMillen, they would allow the claim against the estate.

"13. A few months after the death of Mr. McMillen, Laurence F. Lee moved to Raleigh, North Carolina, to take charge of the Occidental Life Insurance Company in the early fall of 1927, but was a member of the firm of McMillen, Lee, Ryan & Johnson, which firm represented the First National Bank, as its general legal counsel; the firm never handled the business of the McMillen estate, which was handled by Laurence F. Lee, individually, as a family matter and with no retainer to the firm nor compensation to it, and Laurence F. Lee never represented the First National Bank personally in any manner against the McMillen estate, the claim having been prepared by Bryan G. Johnson, as a courtesy to the First National Bank, which was his client, but making no charge for preparing the claim and judgment of allowance in the Probate Court.

"14. When the year for the presentation of claims had almost expired, Mr. Raynolds, as President of the First National Bank of Albuquerque, requested that a formal allowance of the claim be made and Mr. Johnson prepared the claim and a consent judgment of allowance; a meeting was held in Mr. Lee's office in Albuquerque, he having returned from Raleigh to attend to estate matters, and at the meeting on the 3rd of August, 1928, were present Mr. Lee and Mrs. Lee, Mrs. McMillen, Mr. and Mrs. Rodey, and Mr. Woodson, Mrs. Woodson being then in California; at this meeting the question of allowing the bank's claim came up and Mr. Laurence F. Lee explained in detail the facts and business transactions out of which the claim of the First National Bank of Albuquerque arose, after which Mr. Rodey expressed the opinion that it was not a legal claim but perhaps a moral one, and all parties present agreed that it should be allowed, provided that time be given so that the estate could meet other obligations and pay the bank's claim at a more convenient date, without interest for the first two years; at the time said agreement was reached Mr. Raynolds, on behalf of the First National Bank of Albuquerque, agreed to waive its claim against the estate of Mr. McMillen, on account of advanced payment for legal fees, in an amount of $2,964.27, which claim was waived by said bank and was never paid by said estate.

"15. Mr. Woodson left the city for California and arrived there on the 5th of August, 1928, and at about the same time Mrs. Woodson received a letter from Mr. Lee, advising her of the result of the conference about the claim and stating that the settlement would have to go through or the matter would have to be litigated, requesting her to talk with her husband about it and telling her that she was under no obligation to agree to it.

"16. The claim having been prepared with the judgment of allowance, the judgment was approved on its face by all of the heirs, including Mrs. Woodson, by Florence O. McMillen, the widow, and as co-executrix, and then by the First Savings Bank and Trust Company, as co-executor, and on the 13th day of August, 1928, was formally approved by the Probate Court and entered in the estate case therein pending.

"17. The estate has paid $20,000 on the claim, but defaulted on the $7500 installment, due September 1, 1936, and the claim, after its allowance, was assigned by the First National Bank of Albuquerque to Raynolds in October, 1928, and Raynolds is still the owner of it.

"18. The Defendant, Raynolds, did not withhold or conceal from the Plaintiff, or from any of the heirs of McMillen, any fact within his knowledge, nor did he do any act or thing in the matter of having the claim allowed that was fraudulent or deceptive.

"19. The Defendant, Raynolds, as the President of the First National Bank of Albuquerque, which was the claimant, gave no advice as to the allowance of the claim by the First Savings Bank and Trust Company, co-executor, and the trust company, as co-executor, took no part in the negotiations for the allowance of the claim beyond its formal approval thereof after the heirs and the widow, individually, and as co-executrix, had signified their willingness to have it allowed.

"20. That the Defendant, Raynolds, made a full disclosure of the facts within his knowledge concerning the claim to Laurence F. Lee, attorney for the estate, who, in turn, in the conference of the family repeated it in detail to those present and the husband of the Plaintiff, who represented her in the meeting and joined her in California two days later, prior to her approval of the claim, heard a full and complete discussion of the claim by Laurence F. Lee, Pearce C. Rodey and others, including a discussion of their opinion to the right to resist it on legal grounds and the question of whether or not it was a moral obligation that should be accepted and discharged, and Mr. Woodson offered no objection, but, on the contrary, after he arrived in California and talked with his wife, she signed and approved the claim with all of the other heirs.

"21. That, in advising the various heirs, Laurence F. Lee and Pearce C. Rodey were not representing the First National Bank of Albuquerque, but were speaking

from the viewpoint of the family of the decedent, and Laurence F. Lee represented the estate, including the widow and the executors in all legal matters pertaining to the estate, in which position he served with good faith and fidelity to the interests of his clients."

The appellee was president of both the claimant, First National Bank, and the coexecutor, First Savings Bank & Trust Company. To all intents and purposes he occupied the position of coexecutor with a claim against the estate of Alonzo B. McMillen, deceased. A part of appellant's brief is devoted to a discussion of the proposition that since the coexecutor Raynolds was dealing with himself as claimant the judgment allowing the bank's claim was conclusively void. Such is not the law in this jurisdiction. Ware v. Farmers' Nat. Bank of Danville et al., 37 N.M. 415, 24 P.2d 269. Our statute, section 47-110, N.M.Comp.1929, specifically authorizes the appointment of a creditor as administrator of a decedent's estate, but contains no provision outlining the manner of contesting his claim. Kansas has a statute, Gen.St.1915, § 4582, quoted in Re Hoover's Estate, 104 Kan. 635, 180 P. 275, as follows: "§ 4582. Any executor or administrator may establish a demand against his testator or intestate, by proceeding against his coexecutor or coadministrator in the manner prescribed for other persons; but if there be no coexecutor or coadministrator, he shall file his claim and other papers, and the court shall appoint some suitable person to appear and manage the defense on the part of the estate." The court found that appellee dealt with the coexecutor, Mrs. McMillen, and the heirs and beneficiaries under the will, much as he would have been required to do under the Kansas statute, and the practice in other jurisdictions. 3 Bancroft's Probate Practice, p. 1508; 23 C.J. 1027; 24 C.J. 935. The rule applicable to an executor is clearly stated in 2 Bancroft's Probate Practice, p. 648, par. 339, as follows:

"The relations of both executors and administrators to the estate and to those they represent are confidential and fiduciary and they act in a highly fiduciary character in their dealings with the estate and its funds. They are required to exercise the utmost good·faith in dealing with heirs or devisees or others whom they purport to represent, particularly with minors and orphans.

"It is fraud in law for the representative to take, for his own benefit, a position in which his interest will conflict with his duty. The relation of an executor to beneficiaries under the will in taking a quitclaim deed from a beneficiary is such that when the transaction is called in question such executor has the burden of showing that he acted in entire good faith. It is not to be understood, however, that transactions between an administrator and an heir, or between an executor and a devisee or legatee, are necessarily void or even voidable merely because of the fiduciary relationship. If

any such transaction survives the close scrutiny which the law requires, revealing itself as fair and equitable; it will be upheld. * * * "

Appellant maintains that since the relation between appellant and appellee was at all times that of cestui que trust on her part and trustee on his part, consent of appellant to the entry of the judgment and the judgment were presumptively fraudulent and void. Appellant cites Beals v. Ares, 25 N.M. 459, 185 P. 780; Harrison v. Harrison, 21 N.M. 372, 155 P. 356, L.R.A.1916E, 854; Pomeroy's Equity Juris., p. 1750, pars. 957, 958; and other authorities.

Appellant argues in connection with this point the assignments of error: (1) That appellant did not receive an adequate consideration for giving her consent to the entry of the judgment; (2) that prior to giving her consent to the entry of the judgment appellee did not make a complete and full disclosure of the facts and circumstances and transactions upon which the claim and judgment were based; and (3) that appellant did not have the benefit of competent and independent advice concerning the said transaction and her rights regarding the same. Appellant further says that since McMillen owed the banks, of which he was attorney and director, between three and four hundred thousand dollars at the time of his death, appellee and the heirs were not dealing at arm's length when they agreed to approve the allowance of the bank's claim for $31,153.95 against the McMillen estate. While the size of his debt is persuasive of McMillen's dominance in the management of the banks, there is no evidence which would support the suggestion that appellee used this as a club in procuring the allowance of the claim.

Appellee had been advised by Henry Coors, attorney at law, that the First National Bank could hold Mr. McMillen liable on this claim. The disputed claim was allowed against the McMillen estate under the agreement with the heirs. The considerations relied upon are: (1) Forbearance of suit; (2) the waiver of the bank's claim of advance payments of attorneys fees in the sum of $2,964.27; (3) allowance of time for payment of principal debt and waiver of two years' interest thereon. These facts were established by competent evidence and found by the court, and their sufficiency as consideration for the allowance of the claim—aside from the question of fraud—is not seriously questioned by appellant.

There is no question as to full disclosure having been made by appellee to the attorney who represented Mrs. McMillen, coexecutrix, and all the other heirs and the husband of the appellant. The court so found. The evidence is substantial. Appellant testified that she resided in Albuquerque and was on friendly terms with the other members of the McMillen family during the fifteen months which elapsed between the first meeting—

during the life of her father when the matter of this claim was the subject of discussion—and the second meeting held on August 3, 1928. At the first meeting appellee threatened to sue because Mr. McMillen had disputed the claim—denied liability. Appellant's husband joined her in California two days after the meeting in August. He testified: "I told her everything that had happened, just as I have told you." Appellant claimed that she was not informed that her father disputed the legality of this claim (in which she was supported by her husband); that she only learned that fact in the year 1935 when she saw the correspondence between her father and appellee with reference to the claim. The learned counsel for the respective parties agree that the following comment u, subsection 2 of section 170, Restatement of the Law of Trusts, is a fair statement of the rights and obligations involved: "Dealings with beneficiary. Under the rule stated in Subsection (1), if the trustee attempts to acquire an interest in the trust property without the consent of the beneficiary, the beneficiary can avoid the transaction even though the transaction was fair. If the trustee acquires such an interest with the consent of the beneficiary, the transaction cannot be set aside by the beneficiary if the beneficiary was not under an incapacity, and had knowledge of his legal rights and of all material facts which the trustee knew or should have known unless the trustee reasonably believed that the beneficiary knew them, and was not induced by the trustee by undue influence or other improper means to enter into the transaction, and the beneficiary was of competent age and understanding, and the transaction was fair and reasonable."

Did appellee reasonably believe that appellant knew her father denied liability and refused to pay the claim? The court found that the fact that Mr. McMillen disputed the claim was clearly discussed at the August meeting, attended by appellant's husband. There was no fraudulent concealment. It seems improbable that this matter involving a disputed claim of some thirty odd thousand dollars was not mentioned in the presence of appellant by members of the McMillen family during the fifteen months which elapsed between the two meetings, and that appellant's husband failed to hear at the August meeting mention of the fact that Mr. McMillen disputed the claim, although Mrs. Rodey, a sister of the appellant, left the meeting in tears because of the bitterness of the discussion regarding her father. In this meeting Mr. Pearce Rodey, an attorney at law and brother-in-law of appellant, said in effect that there was no legal obligation to pay the claim, although there was a moral one. The appellee had every reason to believe that the appellant knew all the facts.

The third point is that appellant did not have independent advice before she signed the consent judgment. Appellant's counsel requested the court to find "that at all the times alleged in said

complaint, the said plaintiff had full faith and confidence in the ability and integrity of the said defendant; that the said plaintiff signed and executed the consent to the entry of the judgment without having the advice or aid of legal counsel of her own choosing." The court added, "but relied upon the favorable action and judgment of L. F. Lee, P. C. Rodey and her mother," and made the requested finding as changed. Laurence F. Lee and Pearce C. Rodey were brothers-in-law of appellant and prominent young members of the bar of this state. Their wives' interests were common with those of appellant. Laurence Lee wrote to appellant with reference to the August meeting as follows:

"Pursuant to the tentative agreement with the First National Bank, entered into at the conference held yesterday, I have prepared a tentative form of judgment which has been consented to by the First National Bank.

"On account of all of the circumstances, it is desired that the different heirs file a written assent to any judgment entered.

"I have, therefore, prepared the judgment in such a manner that the different parties interested may sign this assent and approval. I herewith enclose a copy of the judgment, as prepared, and will forward the original probably Monday or Tuesday. I am sending the copy in order that you will have a little time to consider it before receiving the original.

"You, of course, understand that you are not under any obligation whatever to assent to this judgment, I will say, however, that we have gone as far as we can in the way of making an adjusted settlement, and if this is not acceptable, it will be necessary for us to refuse to pay anything and then litigate it to conclusion.

"I am writing no details with reference to the claim of the First National Bank, because it is too long and complicated, and Dick can go over it with you in detail."

The husband and mother of appellant, as well as two brothers-in-law, who were lawyers, were all interested in common with appellant. She was advised as to the opinions expressed by the lawyers at the meeting of August 3d, attended by her husband. She knew that her brothers-in-law were of the opinion that the claim of the bank could be defeated. She had a copy of the proposed judgment several days before she signed it. The issue was clearly presented to her as to whether she would join the other heirs in the compromise or fight. These parties, lawyers and laymen, whose interests were common with appellant's, were "independent advisors," and the fact that they left the ultimate decision to appellant does not alter the case.

It is not always necessary to have independent advice in cases of this sort.

"Some cases assert that, at least with regard to gifts from principal to fiduciary, independent advice is an absolute prerequisite to the validity of the transaction; but it is not believed that so stringent and definite a rule can be laid down. It is a question of fact for each chancellor to decide whether independent advice was an essential to fair

play in the case at hand. Such advice will greatly strengthen the witness's case for sustaining the transaction; the absence of it will usually be of great weight in favor of avoidance, but there are many cases where there was no independent advice, or no stress laid upon it, and the transaction was held valid against attack." 3 Bogert's New Text, Trusts and Trustees, p. 1569, § 493.

In Hunter v. Atkins, 3 Myl. & K. 113, after reviewing the English authorities, the Lord Chancellor said: "Where the known and defined relation of attorney and client, guardian and ward, trustee and cestui que trust exists, the conduct of the party benefited must be such as to sever the connection, and to place him in the same circumstances in which a mere stranger would have stood, giving him no advantage, save only whatever kindness or favor may have arisen out of the connection; and that where the only relation between the parties is that of friendly habits or habitual reliance on advice and assistance, accompanied with partial employment in doing some sort of business, care must be taken that no undue advantage shall be made of the influence thus acquired. The limits of natural and often unavoidable kindness, of its effects, and of undue influence exercised or unfair advantage taken, cannot be more rigorously defined. Nor is it, perhaps, advisable that any strict rule should be laid down,—any precise line drawn. If it were stated that certain acts should be the only tests of undue influence, or that certain things should be required in order to rebut the presumption of it, such as the calling in a third person, how easy would it be for cunning men to avoid the one or protect themselves by means of the other, and so place their misdeeds beyond the denunciations of the law, and secure the fruits of them out of its reach. * * *"

See, also, Zimmerman v. Frushour, 108 Md. 115, 69 A. 796, 15 Ann.Cas. 1128, and 16 L.R.A.,N.S., 1087 and note.

This point must be ruled against appellant. "Fraud vitiates nearly every form of conduct affected by its taint." Smyth. v. United States, 302 U.S. 329, 58 S.Ct. 248, 254, 82 L.Ed. 294. But we fail to find evidence of fraud in this record. The findings and conclusions of the trial court that there was full disclosure of all facts by appellee and that there was no fraud in his conduct must be sustained.

Other points are argued, but since appellant failed to show grounds for vacating the judgment it will not be necessary to consider them. 34 C.J. 373.

For the reasons stated the judgment of the district court is affirmed, and it is so ordered.

SADLER, BICKLEY, BRICE, and ZINN, JJ., concur.