**WOOTTEN v. WOOTTEN (two cases).**
**Nos. 3364, 3365.**

Circuit Court of Appeals, Tenth Circuit.
Jan. 25, 1947.

Harry Hammerly, of Chickasha, Okl. (Seth and Montgomery, of Santa Fe, N. M., on the brief), for appellants.

H. A. Kiker, of Santa Fe, N. M., for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

Carl E. Wootten brought an action against John B. Wootten to establish a constructive trust in 53.6 shares of stock in the Red River Ranch, Inc.,[1] a New Mexico corporation. Vendla E. Wootten brought an action against John B. Wootten to establish a constructive trust in 53.6 of such shares. The actions were consolidated. The trial court held the complaints failed to state claims upon which relief could be granted, and dismissed the actions. On a former appeal, we reversed the judgments of dismissal with instructions to overrule the motions to dismiss. See Wootten v. Wootten, 10 Cir., 151 F.2d 147, 149.

In our opinion on the former appeal we said:

"Many forms of conduct regarded as permissible for those acting at arm's length are forbidden to those bound by fiduciary ties. The standards of conduct for a trustee rise far above the ordinary morals of the market place. -Not honesty alone, but a punctilio of honor the most sensitive is the standard of behavior required of a trustee. He must completely efface self-interest. His loyalty and devotion to his trust must be unstinted. Its well-being must always be his first consideration. These principles are inveterate and unbending.

HUXMAN, Circuit Judge, dissenting.

———◆———

---

[1] Hereinafter called the corporation.

"A trustee must not compete with his beneficiary in the acquisition of property. The principle is not limited to cases where the fiduciary acquired property entrusted to him, nor to cases where the fiduciary competes with the beneficiary in the purchase of property which the trustee has undertaken to purchase for the beneficiary. Even though the interest purchased by the fiduciary for himself is not property of the beneficiary entrusted to the fiduciary, nor property which the fiduciary has undertaken to purchase for the beneficiary, the principle applies if the property purchased by the fiduciary himself is so connected with the trust property or the scope of his duties as fiduciary, that it is improper for him to purchase it for himself.

"It was to the advantage of John B. Wootten to secure a majority interest in the stock of the corporation, which gave him control. It was also to the disadvantage of the widow and children because it placed them in the position of minority stockholders. * * *

"It is our opinion that under the facts well pleaded and the facts reasonably to be inferred therefrom, John B. Wootten, in acquiring all of the 536 shares of the Ferguson stock solely for himself individually, failed to measure up to those high standards of conduct which courts of equity have laid down as a measure of behavior required of a fiduciary and that the motions to dismiss should have been overruled.

"It may be on a hearing, John B. Wootten can satisfy the chancellor that, in failing to purchase half of such stock for the estate and for the trusts, he acted in good faith and in the exercise of a wise discretion. That issue, however, we think should be resolved after a full and searching inquiry into the facts."

On remand, issues were joined and evidence was adduced. The material facts are not in dispute.

On July 30, 1936, R. K. Wootten was the owner of certain ranch properties situated in Mora, Colfax, and Harding Counties, New Mexico, consisting of deeded land, land held under purchase contracts from the State of New Mexico, leased land, range cattle, horses, milk cows, and ranch equipment. On that date, R. K. Wootten sold and transferred to his brother, John B. Wootten, an undivided one-half interest in the properties and, thereafter, until the death of R. K. Wootten, the brothers were equal partners in the ownership and operation of the ranch. On July 30, 1936, R. K. Wootten and John B. Wootten entered into a contract with W. R. Ferguson under which Ferguson was to operate and manage the ranch for a term of six years. The contract recited that the ranch properties, other than cattle, had a value of $88,000, and that the cattle had a value of $57,587.-50. It provided that Ferguson would manage and superintend the ranch and its operations for a period of six years from January 1, 1936; that the Woottens would pay him a salary of $100 per month and provide funds for the economical operation of the ranch; that the net profits or losses sustained in the conduct and operation of the ranch, excluding increases in the value of the lands, should be determined annually; that, in the event the net operating profit for the full term of six years should equal 100 per cent of the total investment during such period, including the fixed value of the lands and leases, Ferguson should be entitled to an undivided one-third interest in the ranch lands, leases, livestock, and equipment, and that such interest, at the end of six years, would be transferred to Ferguson; and that, in the event the net operating profit should not equal 100 per cent, an interest in the ranch properties on the basis of the net profits earned would be transferred to Ferguson at the end of the six-year period.

It further provided that, in computing the expenses of operation, 5 per cent per annum on the agreed value of the properties should be charged as expense.

R. K. Wootten died testate January 3, 1938. John B. Wootten was named executor in the will of R. K. Wootten; he duly qualified, and continued to act as such executor until October, 1944. Vendla E. Wootten is the widow of R. K. Wootten, and Carl E. Wootten is the son of R. K. Wootten. Under the terms of his will, R. K. Wootten devised and bequeathed all of his property to Vendla E. Wootten and their four children in equal shares. The

will directed that, after payment of debts, taxes, and administration expense, the executor should distribute to Vendla E. Wootten her share of the property and should distribute the remainder to himself as trustee for the four children; it provided that the share of each child should constitute a separate trust, that the trustee should have full power and authority to sell, transfer, assign, convey, and dispose of any property of any of the trusts, and to invest and reinvest the money and funds of each separate trust in the exercise of his judgment and discretion, that all income and profits of each of such trusts should become a part of the corpus thereof, and that the trustee should distribute and deliver to each child all of the property in his or her respective trust when he or she arrived at the age of 25 years; it directed the executor to make final distribution of the estate to Vendla E. Wootten and John B. Wootten, as trustee, within five years after the death of R. K. Wootten; and it authorized John B. Wootten, as executor, during the period of administration, in the exercise of his discretion, "to sell, transfer, assign, convey, and dispose" of any and all property, funds, and assets in the estate upon such terms and for such considerations as he should deem proper, and expressly authorized him to invest and reinvest any and all moneys coming into his possession, as executor, in such securities as, in his judgment and discretion, he should deem proper.

After the death of R. K. Wootten, John B. Wootten formulated a plan to create a corporation under the laws of New Mexico, and to transfer all of the ranch properties to such corporation. In December, 1939, John B. Wootten, acting for himself individually, and as executor of the estate of R. K. Wootten, deceased, and as trustee for the children, and Vendla E. Wootten and Ferguson entered into a contract whereby they agreed to create such corporation with an authorized capital stock of 2500 shares, each of the par value of $100; to transfer the ranch properties to the corporation; to deliver two-thirds of such stock to John B. Wootten individually, and as trustee for the children, and Vendla E. Wootten, and to retain as treasury stock for the fulfillment of the Ferguson con-

tract, one-third of the authorized capital stock, and on the expiration of the term fixed in such contract, to issue to Ferguson one-third of the shares retained in the treasury, or such portion thereof as Ferguson might be entitled to receive.

The corporation was duly created. Six hundred and ten shares of the capital stock were issued to John B. Wootten individually, 122 shares to Vendla E. Wootten, and 488 shares to John B. Wootten, as trustee for the children. The remaining shares, except one share issued to Ferguson, were held in the treasury. Vendla E. Wootten's stock was not delivered to her until January 15, 1944.

A controversy arose between John B. Wootten and Ferguson as to the interest in the ranch properties that Ferguson was entitled to receive under his contract. Ferguson brought an action in the District Court of the Eighth Judicial District of New Mexico against the corporation and others. On December 4, 1942, a decree was entered in that case. It adjudged that Ferguson was entitled to receive 570 shares of such stock, including the one share theretofore issued to him; that John B. Wootten was entitled to receive 20 additional shares individually, and 16 additional shares as trustee, and that Vendla E. Wootten was entitled to receive 4 additional shares.

Following the entry of such decree, John B. Wootten discontinued the services and employment of Ferguson and took over the sole and exclusive operation and management of the corporation and its ranch properties.

Prior to January 15, 1944, John B. Wootten began negotiations with Ferguson to purchase the latter's corporate stock. Ferguson had disposed of 34 shares of the stock issued to him. John B. Wootten consummated the purchase of the remaining 536 shares of the Ferguson stock on January 15, 1944, for $87.50 per share.

Linder, Burk and Stephenson, a firm of certified public accountants, made an audit of the corporation's books, covering the period from January 1, 1942, to January 31, 1944. The audit reflected that on January 31, 1944, the corporate assets were as

follows: Current assets, consisting of cash on deposit, inventories, moneys due from the United States and other accounts payable, aggregated $172,359.19; United States Treasurer's Certificates of Indebtedness, $10,004.08; property, on the basis of cost less depreciation, consisting of land, $85,087.17;[2] improvements, $48,046.83; equipment, $8,052.73; and fencing, $467.80, aggregated $141,654.53. It set up a reserve for depreciation of $13,489. It added prepaid insurance premiums of $400.04, leaving total net assets of $310,928.84. No value was assigned to the state land leases. The rental is three cents per acre. It costs less to run cattle on lands leased from the state than on patented lands. State leases are valued at about $1 per acre. When an owner of patented lands has secured state leases of adjacent lands, while he has no legal right to a renewal of his lease, by custom, such leases are renewed so long as the lessee complies with the rules of the land office. The value of the state leases was probably reflected in the value of the lands.

The audit reflected current liabilities of $12,636.28, long-term liabilities on state land purchase contracts of $20,041.46, and a net worth of $278,251.10.

The book value of the stock in the corporation was $141.28 per share, January 31, 1943; $152.04, January 31, 1944; and $150.44, January 31, 1945.

John B. Wootten testified that the market value of the land between the time he purchased a half interest in the ranch in 1936 and January 31, 1944, had increased 20 or 25 per cent.

The ranch properties included 12,654.91 acres of deeded land, 45,181.55 acres of land held under leases from the State of New Mexico, and in excess of 4,000 acres of land under purchase contracts from the State of New Mexico.[3]

The range cattle were included in the inventory at the following values: Cows, -$45; two-year-old beef steers, $65; two-year-old heifers, $45; heifer calves, $40; weaned calves, $35; unweaned calves, $30; and bulls, $100 per head. They had been carried at those values since January 31, 1942. Such values were conservative.

In addition to being a trustee under the four trusts created by the will of R. K. Wootten, John B. Wootten was the trustee under four other trusts in which Richard K. Wootten, Jr., was the beneficiary, four other trusts in which Gerda Corrine Wootten was the beneficiary, four other trusts in which Vendla Wootten was the beneficiary, and three other trusts in which Carl E. Wootten was the beneficiary. Richard K. Wootten, Jr., is a son, and Gerda and Vendla are daughters of R. K. Wootten and Vendla E. Wootten. In January, 1944, the approximate value of the property in the Richard K. Wootten, Jr., trusts was $354,000, in Gerda's trusts, $354,000, in Vendla's trusts, $354,000, and in Carl E. Wootten's trusts, $293,643. In January, 1944, the approximate value of the property in each of the four trusts created by the will of R. K. Wootten was $85,000.

In January, 1944, there were ample cash funds in the hands of John B. Wootten, as trustee of the several trusts, to purchase, in behalf of the beneficiaries under the R. K. Wootten trusts, their pro rata share of the Ferguson stock.[4]

A report of John B. Wootten, as executor, filed in the county court of Grady County, Oklahoma, shows cash on hand in the estate as of April 22, 1943, of $78,159.18. On December 31, 1943, the executor made a partial distribution to the beneficiary of $60,000. A report filed by the executor on December 31, 1943, shows a cash balance in the estate, after such distribution, in excess of $30,000.

The ranch suffered from drought in the summer of 1940, and it was necessary to obtain pasturage for the cattle on two other ranches. The ranch experienced a heavy snowstorm in November, 1940. Notwithstanding these adverse conditions, the

---

[2] The land values were on the basis of the cost thereof to John B. Wootten at the time he purchased his one-half interest in 1936.

[3] The exact acreage of the state purchase lands is not reflected in the record.

[4] On December 31, 1943, the cash on hand in the Richard K. Wootten, Jr., trusts was $27,094.24; the Gerda Corrine Wootten trusts, $15,910.43; the Vendla Wootten trusts, $18,173.29; and the Carl E. Wootten trusts, $21,566.64.

net operating profit from cattle on the agreed value of $145,587.50 under the Ferguson contract, during the period of such contract, amounted to 94 per cent.[5] Moreover, in computing the 94 per cent, there was deducted, as operating expenses, 5 per cent per annum on the agreed value of the land and equipment; that is, on $145,587.50, so that the actual profit for such period was 124 per cent.

The gross income from operations for the year ending January 31, 1943, was $47,570.86. From this was deducted $977.89, interest, and $57,000, the par value of the stock issued to Ferguson for services rendered during the period from January 1, 1936, to January 1, 1942, leaving a net loss of $10,407.03. The net profit from operations for the year ending January 31, 1944, was $33,865.15. The Federal and state income taxes on income for that year aggregated $11,939.64, leaving a net profit of $23,158.31.

The audit above referred to was completed July 10, 1944. A copy was sent to Vendla E. Wootten and the children on July 14, 1944. Prior to furnishing the audit, John B. Wootten had not furnished Vendla E. Wootten or the children annual reports, trial balances at the end of the fiscal years, or financial statements showing the value of the ranch property or the financial results from the operation of the ranch. Vendla E. Wootten had no knowledge respecting the value of the ranch property until she received the audit in 1944.

John B. Wootten testified that in 1941, he had a conversation with Vendla E. Wootten respecting the purchase of the Ferguson stock; that she stated she did not desire to buy any for herself; that he told her that, in his judgment, it was not wise to buy any of the stock for the children because it was a closed corporation and a hazardous business; that at the time the purchase was consummated, he asked her if she wanted to change her mind about purchasing any of the Ferguson stock and that she replied, "No."

John B. Wootten admitted that in all of the conversations with Vendla E. Wootten, relative to purchasing the Ferguson stock, he represented that the price was too high and that it was not "a good buy."

On July 31, 1945, John B. Wootten, as trustee of the trusts of Richard K. Wootten, Jr., submitted to the latter an itemized account of his administration of such trusts. Prior to that time, during the eight years he had been trustee of the children's trusts, he had not submitted a report to any of them.

On March 6, 1944, Vendla E. Wootten wrote a letter to John B. Wootten in which she stated she had discussed the matter of the Ferguson stock with Richard K. Wootten, Jr., and had decided that she and the children should purchase half of such stock.

On March 8, 1944, John B. Wootten replied to the letter of March 6, stating that he was perfectly willing to turn over some of the Ferguson stock to Richard K. Wootten, Jr., and to Vendla E. Wootten, but that it was against his judgment to use trust funds to purchase any of such stock for the other children; that the price was high and that he did not think he should invest the trust funds of the other children in stock of a closed corporation, where there would be few buyers if they should later desire to dispose of the stock. On March 16, 1944, Vendla E. Wootten wrote a letter to John B. Wootten, in which she stated that since her family and John B. Wootten had been equal partners in the ranch, it should be kept that way; that John B. Wootten should take half of the stock and she and the children should each take one-tenth of the stock, or the remaining one-half. On March 29, 1944, John B. Wootten wrote a letter to Vendla E. Wootten, in which he stated that the stock could not be divided equally because H. A. Kiker had acquired 34 shares of the Ferguson stock, and that it was now too late to divide the remainder of the Ferguson stock because he had made gifts of part of it to his children, sold part of it to his wife, and kept only a small part of it himself; that he did not think it was a proper investment for the children's trust funds, and that to have handled the stock the way she sug-

---

[5] The operating profit was in part due to the increase in the value of the cattle.

gested would have required approximately $5,000 from her and approximately $5,000 from each child, and the children did not have money available to purchase the stock.

Thereafter, in reply to the last-mentioned letter, Vendla E. Wootten wrote a letter to John B. Wootten, in which she stated that he was "on the ground floor" and knew about the ranch, the loss or profit resulting from its operation, and the values of the stock, that neither she nor the children had been given a fair opportunity to acquire their share of the Ferguson stock, and she demanded that he should turn over half of the Ferguson stock acquired by him to her and the children; she further stated that if it was good enough for his wife and his children, it was good enough for her and her children. On April 8, in reply to the letter mentioned last, John B. Wootten wrote Vendla E. Wootten that he did not think that the stock was a good investment for her children, and that they did not have money available to purchase the stock at the time it was acquired.

In his letter to Vendla E. Wootten of March 29, John B. Wootten stated "during 1942 and 1943, I had to keep the money in the bank, $60,000.00 lying idle, in order to be prepared to pay off the day we could trade with Ferguson. Just take for granted that the stock was bought worth the money, which I assure you it was not, I would be entitled to the stock for that reason, if no other." This clearly indicated that John B. Wootten intended all along to purchase the Ferguson stock for himself personally, and not to permit his beneficiaries to participate in such purchase.

Vendla E. Wootten agreed to the formation of the corporation because John B. Wootten, in whom she had complete trust and confidence, advised her so to do.

She admitted that she had told John B. Wootten, prior to the purchase of the Ferguson stock, that she did not desire to purchase any of the stock individually. She testified, however, that when the matter was discussed with her, John B. Wootten had said: "We will have to buy Ferguson out," and that she thought John B. Wootten would buy half of the stock and the other half of the stock would be purchased by the estate of R. K. Wootten.

Prior to 1945, there was an outbreak of anthrax in the section of the country where the land was located. In 1945, there was an outbreak of anthrax on the ranch. Twenty-four head of cattle, mostly bulls, were lost. It was necessary to vaccinate the cattle against anthrax. The cost of the vaccine was approximately $500.

During some winters, there are heavy snows on the ranch and it becomes necessary to feed the cattle for substantial periods of time.

John B. Wootten, as president and general manager of the corporation, completely dominated the corporation from the date it was organized.

From the foregoing facts, the trial court made two conclusions, which he designated as conclusions of law, to the effect that John B. Wootten, as executor under the will of R. K. Wootten, and as trustee of the several trusts, had acted wisely and prudently and, in not buying any of the Ferguson stock for the estate or for the trusts, had acted in good faith and with an honest purpose.

In an informal opinion, the trial court stated in effect that the acquisition of the Ferguson stock by John B. Wootten, which gave him individually, stock control instead of equal voting power, took nothing away from his beneficiaries. This was a clear departure from the holding in our former opinion.

From adverse judgments, Vendla E. Wootten and Carl E. Wootten have appealed.

Like actions brought by Richard K. Wootten, Jr., Vendla, and Gerda are pending. The parties have agreed that such actions shall be controlled by the result in the Carl E. Wootten case.

■ As trustee under the several trusts, John B. Wootten occupied a fiduciary relationship to the children. As executor of the estate of R. K. Wootten, he occupied a fiduciary relationship to the beneficiaries of the estate, that is to Vendla E. Wootten and

the children.[6] And there is respectable authority in support of the proposition that, as president and general manager of the corporation which was under his complete domination, he occupied a fiduciary relationship to Vendla E. Wootten as a stockholder, and to the children as the owners of beneficial interests in stock of the corporation.[7]

John B. Wootten gave as one reason why he deemed it inadvisable to purchase any of the Ferguson stock in behalf of the trusts or the estate of R. K. Wootten, that it was stock in a closed corporation and in case a stockholder desired to sell, it would be difficult to find a buyer outside of the other stockholders.

When John B. Wootten became trustee and executor under the will of R. K. Wootten, the ranch properties were being operated as a partnership, John B. Wootten owning a one-half interest and Vendla E. Wootten and her four children owning, in equal shares, the beneficial title to the remaining one-half interest. John B. Wootten thereafter brought about the formation of the corporation and the transfer of the ranch properties to the corporation in exchange for its stock, in order, as he testified, to avoid having to liquidate the ranch properties, as the surviving partner of R. K. Wootten. And as trustee for the children, he accepted stock in a closed corporation, wherein each child became a minority stockholder. He transferred one-tenth of such properties, which would otherwise have passed to Vendla E. Wootten as beneficiary under the will, in exchange for stock in a closed corporation, where she likewise became a minority stockholder. For so doing, we do not criticize him. As executor under the will, he was fully authorized to sell and dispose of the one-half interest in the ranch properties that fell into the estate of R. K. Wootten, and to accept such consideration

therefor as he deemed advisable, and invest and reinvest the proceeds of such sale. From such transactions he derived no individual advantage, except, perhaps, the avoidance of liquidation of the ranch properties. The stock ownership of Vendla E. Wootten and her four children equaled the stock ownership of John B. Wootten. Neither had an advantage over the other through stock ownership. It is significant, however, that when John B. Wootten, acting as trustee, transferred the children's interests in the ranch properties for stock in the corporation, the fact that he was thereby investing the trust funds of each child in a closed family corporation did not give him concern. His action, then, is utterly inconsistent with the position he took with respect to the purchase of the Ferguson stock, especially when, by acquiring all of the Ferguson stock for himself individually, he destroyed the equality of stock ownership of the two families, acquired absolute stock control of the corporation, and relegated Vendla E. Wootten and the children, both individually and collectively, to the role of minority stockholders.

Moreover, the problem presented to John B. Wootten, as trustee, with respect to the purchase of the Ferguson stock, was not simply whether he should make an original investment of trust funds in the stock of the corporation, but whether he should purchase one-half of the Ferguson stock for Vendla E. Wootten and the children, and thus protect the investments he had theretofore made for them through keeping equal the amount of stock owned by the two families.

John B. Wootten gave as a second reason that the price at which the Ferguson stock could be purchased was too high. It is significant that, while he was repeatedly representing to Vendla E. Wootten that

---

[6] Woodson v. Raynolds, 42 N.M. 161, 76 P.2d 34, 38, 39; Bruun v. Hanson, 9 Cir., 103 F.2d 685, 698.

In Woodson v. Raynolds, the court said:

"The relations of both executors and administrators to the estate and to those they represent are confidential and fiduciary and they act in a highly fiduciary character in their dealings with the estate and its funds. They are required to exercise the utmost good faith in dealing with heirs or devisees '* * *.'"

[7] Dunnett v. Arn, 10 Cir., 71 F.2d 912, 917, 918; Fletcher, Cyclopedia, Corporations, Perm.Ed., Vol. 3, Ch. 11, §§ 838, 848: Horbach v. Coyle, 8 Cir., 2 F.2d 702.

the price at which the Ferguson stock could be purchased was too high and that it was not a good buy at that price, John B. Wootten was withholding from her and the children, corporation reports that would have shown the stock had book value of approximately $65 per share in excess of the price Ferguson was asking, and that the corporation had enjoyed very substantial earnings for the years 1942 and 1943.

Having failed to make reports of his stewardship under the children's trusts, either to Vendla E. Wootten or to the children, as beneficiaries, when pressed by Vendla E. Wootten to purchase one-half of the Ferguson stock in behalf of her and the children, he offered to let Vendla E. Wootten, and Richard K. Wootten, Jr., participate, but refused to purchase any of the stock for the other three children, and falsely represented that they did not have available cash with which to purchase such stock. It should be observed that a pro rata participation in the purchase of the Ferguson stock by Vendla E. Wootten and Richard K. Wootten, Jr., would still have left John B. Wootten the individual owner of more than 50 per cent of the stock of the corporation and with stock control thereof.

From the standpoint of book value and earnings, the price asked by Ferguson was exceedingly attractive. It may not have been so attractive to one who would acquire, by an initial investment, only a minority stock interest. But here, there was already invested in the trust estate of each child, stock in the corporation of the book value of approximately $19,152, and there had been distributed to Vendla E. Wootten, as a beneficiary under the will, stock of the book value of $19,152. To prevent John B. Wootten individually, from acquiring a majority of the stock of the corporation and stock control thereof, and to maintain the equality of stock ownership of both families, it would have been necessary to invest $4,690 in behalf of Vendla E. Wootten and $4,690 in behalf of each of the children. In other words, it was not the question of an initial investment in corporate stock, but whether an investment of $4,690 should be made in stock which,

on the basis of book value and earnings, was worth substantially in excess thereof, to protect an investment of each beneficiary of the book value of $19,152.

██ Under the will, John B. Wootten clearly had the power to purchase one-half of the Ferguson stock for the estate of R. K. Wootten, and to distribute it to Vendla E. Wootten and to the children's trusts, in equal shares. Under the will, he clearly had the power to purchase four-tenths of the Ferguson stock with trust funds and one-tenth with funds of the estate, and to distribute the latter one-tenth to Vendla E. Wootten and charge her future distributions with the cost thereof. Funds were available, both in the estate and in the trusts, with which to purchase one-half of the Ferguson stock.

John B. Wootten gave as his third reason that cattle ranching is a hazardous business.

That cattle ranching is attended with hazards and would not ordinarily be regarded as a prudent investment for trust funds may be admitted. But, here, it must be observed again that John B. Wootten, with full power, both as executor and trustee, to dispose of his deceased brother's one-half interest in the ranch properties, had decided to retain such properties, to transfer them to a corporation, to place 126 shares of the stock in such corporation in the trust estate of each child, and to distribute 126 shares of such stock to Vendla E. Wootten, as a beneficiary under the will, and that the problem was not that of an initial investment in stock of the corporation, but of protecting the investments already made by him as trustee under the children's trusts, and as executor under the will.

While protesting his good faith, the actions of John B. Wootten speak more impressively than his words. As president and general manager of the corporation, he withheld corporate reports from Vendla E. Wootten and the children, and, instead of making full disclosure to Vendla E. Wootten and the children with respect to the earnings of the corporation and the book value of its stock, he falsely represented that $87.50 was a high price for the Fergu-

son stock and that it was not a "good buy" at that price.

When John B. Wootten desired to transfer the ranch properties to a corporation, in order to avoid having to liquidate them as a surviving partner, he did not hesitate to transfer the one-half of the ranch properties belonging to the estate of R. K. Wootten in exchange for stock in the corporation, and to distribute such stock to himself, as trustee for the children, and to Vendla E. Wootten, as a beneficiary under the will, although the result was the investment of property of his beneficiaries in stock in a closed corporation. But, when the opportunity to purchase the Ferguson stock was presented, he refused to protect the investments already made, acquired the Ferguson stock individually, refused to permit Vendla E. Wootten and her children to purchase one-half thereof, finally acceded to Vendla E. Wootten's demands to the extent of offering to permit her and Richard K. Wootten, Jr., to participate in the purchase, falsely represented that each of the other children did not have in his or her respective trusts, available cash with which to purchase one-tenth of the Ferguson stock, and insisted on retaining enough of the Ferguson stock to give him stock control of the corporation. In other words, John B. Wootten refused to use $23,450 of available funds in his hands, as trustee and executor, to protect investments he had theretofore made, as trustee and executor, of the book value of $97,760, and steadfastly refused to pursue any course with respect to the purchase of the Ferguson stock that would not leave in the hands of himself individually, his wife and his children, more than 50 per cent of the outstanding stock of the corporation, and sought to justify his actions by false representations to Vendla E. Wootten and her children.

We think the undisputed facts in this record compel the conclusion that John B. Wootten, in purchasing the Ferguson stock, did not completely efface self-interest, did not exercise his judgment and discretion with unstinted loyalty to his cestuis que trustent and did not conform to the standards of conduct required of a trustee hereinabove set out, and that he should have been held to account for stock in the corporation equal to one-half of the Ferguson stock purchased by him, as a trustee for Vendla E. Wootten and the children. Equitable adjustment should be made with respect to dividends that have been paid on the stock and for interest on moneys advanced by John B. Wootten to purchase the stock.

The judgment is reversed and the cause remanded with instructions to proceed further in accordance herewith.

HUXMAN, Circuit Judge (dissenting).

I fully concur in the findings of fact and conclusions of law of the learned trial court, and therefore am unable to concur in the majority opinion. No useful purpose would be served in setting out in detail the analysis of the evidence which, in my view, justifies the conclusions of the trial court. The majority opinion seeks to make the trustee the prime mover in the incorporation of the partnership. The reocrd reveals that the interested parties, including Ferguson, sought the advice of a competent attorney, and that it was his advice that they form a corporation, and that they all acted thereon. The attorney represented all the parties and not the trustee. Not only that, but he gave them sound advice. He advised the formation of the only kind of an organization through which the ranch could be continued. The mere fact that the trustee chose to leave trust funds which he found in the ranch in the corporation and thus continue the existing interest in the ranch does not convict him of either bad faith or bad judgment in refusing to invest free trust funds in the venture. And that is so even though it be conceded that the venture might continue to be profitable.

There is no claim here that the trustee mismanaged the trust funds or that his lack of integrity as a trustee resulted in a loss to the estate. It is admitted that the management of the trust funds resulted in a very substantial profit. The only complaint is that he refused to make a particular investment. The reasons why he thought further investment of trust funds in this closed corporation were not advisable are not only adequate, but to me are compelling. Only one need be noted. The trustee stated that it was his policy to keep the trust

576

funds liquid so that they would be available to the beneficiaries when they reached the period when it was his duty to distribute them. If he was able to do this and yet make them earn an adequate return, it was of great advantage to these young people when they became of such maturity that they could manage their own affairs to have their property separate and distinct so that they might take possession thereof.

Neither do I agree that at the time this stock was for sale, the trustee as executor under the will had power to invest estate funds in this stock. The ordinary duties of an executor or administrator are to marshal the assets and distribute them under the terms of the will. This will give the executor discretionary power to invest the cash funds of the estate during the period of administration. The period of administration fixed in the will had, however, expired, and any beneficiaries had a legal right to demand a distribution of the cash assets. It follows that the executor therefore had no further right to make investments of the cash in his possession. His remaining duty was to distribute the cash on hand, and had a loss resulted, he would have been liable to those entitled thereto.

There is implied in the narration of facts of the majority opinion a charge of bad faith, or, stated otherwise, a failure to discharge that high degree of responsibility due from a trustee by concealing from Vendla E. Wootten information concerning the affairs of the corporation. She was a member of the Board of Directors. It is without dispute that she attended some of the Directors' meetings and participated therein. Furthermore, she not only told John Wootten that she did not want any more stock in this corporation, but she also told others, including her banker, that she did not want any more of her money invested in ranch enterprises. Later, when she asked for some of this stock, the trustee offered to transfer it to her. He did the same with Richard K. Wootten when he became of age. But they were not satisfied with this. They demanded that he also transfer to the remaining trusts a ratable portion of this stock. Unfortunately they did not possess the power of making these investments or these decisions. No

doubt had the deceased trustor intended to invest them with such authority, he would have made them trustees. But not only do we by our decision give them this power, but we join them in directing the trustee to make a particular investment. We do this not because we think he has handled these trust funds improvidently, but because we believe it is for the best interests of the beneficiaries that the stock ownership in the corporation be kept on a parity basis, and that his failure to do this constitutes legal faithlessness on his part. This is purely a matter of discretion which was vested in the trustee by the trustor, and we should not substitute our judgment for his.

For these reasons I am forced to dissent.